[S.F. No. 22984. In Bank. Mar. 16, 1973.]

JAMES C. THOMPSON, Petitioner, v.
ANGELE MELLON, as City Clerk, etc., Respondent.

## COUNSEL

Wyckoff, Miller & Comstock and Robert B. Yonts, Jr., for Petitioner.

Rodney R. Atchison, City Attorney, for Respondent.

## OPINION

**SULLIVAN, J.**—This proceeding for a writ of mandate challenges the constitutionality of a provision of the Charter of the City of Santa Cruz which prescribes a two-year durational residence requirement for candidates for the office of city councilman. We have concluded that this provision violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.

The petition alleges in substance the following facts. Petitioner James C. Thompson has resided in Santa Cruz County since 1966, has practiced law in the City of Santa Cruz since September 1966, but has resided in the City of Santa Cruz (City) only since September 23, 1972. Respondent Angele Mellon, the city clerk, refused to file, despite their timely presentation, petitioner's nominating papers for his candidacy for the office of city councilman in the election scheduled for April 10, 1973, because petitioner had not been a resident of the City for the two years next preceding his nomination as required by section 602 of the City charter.[1] Invoking our original jurisdiction, petitioner seeks a writ of mandate commanding respondent city clerk to file his nomination papers and to place his name on the ballot prepared for the election to be held on April 10, 1973, if he meets all requirements other than the two-year durational residence requirement of the City charter.

The city clerk in her return to the alternative writ admits that an election for the office of city councilman is scheduled for April 10, 1973, and that she refused to file nominating papers for petitioner's candidacy allegedly on the ground that he did not qualify under the provisions of section 602 of the City charter but denies the remaining allegations of the petition which in the main assert that petitioner is otherwise qualified as a candidate.

Preliminarily, we briefly observe that since this case involves substantial issues of great public importance involving the right to be a candidate for public office which must be resolved promptly, we deem it proper to exercise original jurisdiction. (*Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 750-751 [100 Cal.Rptr. 290, 493 P.2d 1154]; *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, fn. 1 [96 Cal.Rptr. 697, 488 P.2d 1].) Mandate is the proper remedy. (*Wenke* v. *Hitchcock, supra,* 6 Cal.3d 746, 751; *Jolicoeur* v. *Mihaly, supra,* 5 Cal.3d 565, 570, fn. 2.)

We turn to the merits. Petitioner contends that the two-year durational residence requirement unconstitutionally restricts his fundamental right to seek public office because it is not necessary to achieve a compelling governmental interest. He relies upon *Camara* v. *Mellon* (1971) 4 Cal.3d 714 [94 Cal.Rptr. 601, 484 P.2d 577] and *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716 [94 Cal.Rptr. 602, 484 P.2d 578].

In *Camara* this court held that the *three*-year durational residence then

---

[1]Section 602 provides: "No person shall be eligible to be nominated for or to hold office as a member of the Council unless he is a registered qualified voter of this city, and shall have been for at least two (2) years next preceding his nomination or appointment, a resident of the City of Santa Cruz or of territory annexed thereto."

required by the Santa Cruz City Charter for candidates for city councilman violated the equal protection clause of the Fourteenth Amendment for the reasons "to be further elucidated" in *Zeilenga*. Subsequently, in *Zeilenga* we held that the five-year durational residence requirement imposed by the Butte County Charter for candidates for the county board of supervisors violated the equal protection clause of the Fourteenth Amendment. We there said: "[W]e are not convinced that the five-year provision constitutes ' "the least restrictive method of achieving the desired purpose" ' [citation], namely a reasonable knowledge by a proposed candidate of the general requirements of his county." (*Zeilenga* v. *Nelson, supra,* 4 Cal.3d at p. 723.)

We concluded in *Zeilenga* that the right to hold office was a fundamental right and that restrictions upon its exercise must, therefore, be strictly scrutinized.[2] Indeed, we declared in effect that the right to be a candidate for public office was inextricably intertwined with the right to vote and equally as fundamental. We said: " '[T]he right to vote would be empty indeed if it did not include the right of choice for whom to vote. . . . But it does mean that in judging the validity of a restraint upon eligibility for elective office, we must be mindful that the restraint is upon the right to vote as well. . . . Far from being unrestricted, the power to prescribe qualifications for elective office is sharply limited by the constitutional guaranty of a right to vote. . . .' " (*Zeilenga* v. *Nelson, supra,* 4 Cal.3d at p. 721, quoting *Gangemi* v. *Rosengard* (1965) 44 N.J. 166 [207 A.2d 665, 667]); "[T]he right to run for public office is as fundamental a right as is the right to vote, . . ." (*Zeilenga* v. *Nelson, supra,* 4 Cal.3d at p. 723.)

It is noteworthy, however, that after our decision in *Zeilenga,* the United States Supreme Court in *Bullock* v. *Carter* (1972) 405 U.S. 134 [31 L.Ed.2d 92, 92 S.Ct. 849], apparently deemed it unnecessary to declare that the right to run for public office was in itself a fundamental right requiring the "strict scrutiny" test. Rather, the high court examined the interrelation between the restrictive effect of candidates' filing fees on the candidates' right to run for office and the voters' right to vote for candidates of their choice and remarked: "The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a

---

[2]We quoted from our opinion in *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224], where we had declared that "in cases involving 'suspect classifications' or touching on 'fundamental interests,' the [United States Supreme Court] has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (Pp. 784-785.) (Original italics; fns. omitted.)

rigorous standard of review. [Fn. omitted.] However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. . . . [t]he Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of such barriers does not of itself compel close scrutiny. . . . In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." (405 U.S. at pp. 142-143 [31 L.Ed.2d at pp. 99-100].) Following such examination, the court determined that the exclusion of candidates from the ballot who could not afford to pay the filing fees, thereby tending "to deny some voters the opportunity to vote for a candidate of their choosing" had a "real and appreciable impact on the exercise of the franchise, . . ." (*Id.* at p. 144 [31 L.Ed.2d at p. 100].) The high court then concluded that the Texas filing fee system "must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." (*Id.* at p. 144 [31 L.Ed.2d at p. 100].) Thus, *Bullock* held that restrictions upon candidacy for public office which excluded a significant group of potential candidates from the ballot must be "closely scrutinized."

The overwhelming weight of recent authority, both before and after *Bullock* has held that durational residence requirements as a precondition to candidacy for public office have such a substantial impact on the right to vote as to invoke the "strict scrutiny" test.[3] Typical of the pre-*Bullock* cases is *Mogk* v. *City of Detroit, supra,* 335 F.Supp. 698, 700-701: "The Supreme Court has, in election cases, dealt most often with voters' rights rather than the rights of persons to become candidates for public office, but it seems to us that they are, in the main, inextricably intertwined. *Reynolds, supra,* and *Williams, supra,*[4] hold that a citizen has a right to

---

[3]*Manson* v. *Edwards* (E.D.Mich. 1972) 345 F.Supp. 719, 721-724; *Wellford* v. *Battaglia* (D.Del. 1972) 343 F.Supp. 143, 145-148; *McKinney* v. *Kaminsky* (M.D. Ala. 1972) 340 F.Supp. 289, 294-295; *Mogk* v. *City of Detroit* (E.D.Mich. 1971) 335 F.Supp. 698, 700-701; *Bolanowski* v. *Raich* (E.D.Mich. 1971) 330 F.Supp. 724, 726-730; *Gangemi* v. *Rosengard* (1965) 44 N.J. 166 [207 A.2d 665]. But see *Walker* v. *Yucht* (D.Del. 1972) 352 F.Supp. 85 (three-judge court) where the court refused to apply the "strict scrutiny" test to a three-year durational residence requirement upon candidacy for the state general assembly; *Draper* v. *Phelps* (W.D.Okla. 1972) 351 F.Supp. 677 (three-judge court) where the court refused to apply the "strict scrutiny" test to a six-month durational residence requirement upon candidacy for the state Legislature; and *State* ex. rel. *Gralike* v. *Walsh* (Mo. 1972) 483 S.W.2d 70, and where the court refused to apply the "strict scrutiny" test to a one-year durational residence requirement upon candidacy for the state senate.

[4]*Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]; *Williams* v. *Rhodes* (1968) 393 U.S. 23 [21 L.Ed.2d 24, 89 S.Ct. 5].

vote effectively and, by logical extension, that means that he is to be given a wide latitude in his choice of public officials." The court then applied the "strict scrutiny" test and declared a three-year residence requirement for membership on the city revision charter commission unconstitutional.

Two post-*Bullock* cases clearly demonstrate why durational residence requirements as a precondition to candidacy for public office must be tested by the "strict scrutiny" test. "The right to hold or run for public office has not as yet been expressly declared by the Supreme Court to have the same status [as the right to vote]. [Fn. omitted.] After so noting, however, the court in *Bullock* proceeded to note the interrelation between restrictions on the right to candidacy and restrictions on the right to vote: . . . Unlike the Texas filing fee system and the laws concerning candidacy considered by the Supreme Court in other cases, [fn. omitted] the burden of Section 3-300 [five-year residency requirement to run for mayor] does not fall more heavily on minority economic or political groups. This distinction, while significant, does not render the *Bullock* case inapplicable, however. As I read that case the grounds asserted for utilizing the 'compelling interest' test were alternative. Accordingly, where the law in question poses an absolute barrier to the candidacy of a not insubstantial segment of the community and, to that degree, limits the voters in their choice of candidates, the more strict standard of review must be applied. [Citations.]" (*Wellford* v. *Battaglia, supra,* 343 F.Supp. at pp. 146-147; accord: *Manson* v. *Edwards, supra,* 345 F.Supp. 719, 721-724, where the court applied the "strict scrutiny" test to a provision of the Charter of the City of Detroit requiring all candidates for city council to be at least 25 years of age.)

Some courts have applied the "strict scrutiny" test to durational residence requirements to run for office on an entirely different theory, namely the right to travel. The Sixth Circuit in declaring unconstitutional a city charter provision which required two years' residence in the city as a condition of eligibility to hold elective office, said: "The durational residency requirement at issue classifies Plymouth residents on the basis of recent travel. That classification alone requires that the requirement be strictly scrutinized because it operates to penalize the exercise of the basic constitutional right to travel. Dunn v. Blumstein, 405 U.S. 330, 338, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). It is not material that the classification denies new residents something that is not a constitutional right, i.e., the right to become a candidate for public office. [Citations.]" (*Green* v. *McKeon* (6th Cir. 1972) 468 F.2d 883, 884-885.)

The court in *Wellford* based its application of the "strict scrutiny" test alternatively on the right to travel: "Moreover, application of the com-

pelling interest test is required in this case for a wholly independent reason. . . . The right to travel referred to by the court in the *Dunn* case is a right to intrastate as well as interstate migration. [Fn. omitted.] King v. New Rochelle Municipal Housing Authority, 442 F.2d 646 (2nd Cir. 1971). Moreover, the motive behind a challenged law and its actual effect on the right to travel are not relevant considerations in determining the appropriate standard of review. If the statute places a penalty on migration, it does not matter whether the legislature intended to deter travel or whether the penalty in fact has that effect. Dunn v. Blumstein, *supra,* 405 U.S. at pp. 339-341, 92 S.Ct. 995. [¶] Section 3-300 classifies bona fide residence on the basis of recent travel, penalizing those persons and only those persons who have recently exercised their constitutional right of migration. For this reason alone it must meet the compelling interest test." (*Wellford* v. *Battaglia, supra,* 343 F.Supp. at pp. 147-148.)

■ Thus, it is abundantly clear that durational residence requirements imposed as a precondition to candidacy for public office must be tested by the "strict scrutiny" test, either because as held by this court in *Zeilenga* the right to be a candidate for public office is a fundamental right in itself or because as held in the cases discussed above, such restrictions on the right to be a candidate impinge on other fundamental rights, namely the right to vote and the right to travel.

■ Mindful of the foregoing decisions, we now turn our attention to the application of the "strict scrutiny" test to the two-year durational residence requirement imposed by the Santa Cruz City Charter. The crucial question which we face is this: Has the City met its burden of establishing that this durational residence requirement conditioning the right to run for public office promotes a *compelling* governmental interest and that such requirement is *necessary* to further such interest? In *Zeilenga* this court recognized that the state has a legitimate interest in requiring "a reasonable knowledge by a proposed candidate of the general requirements" (4 Cal.3d at p. 723) of the public entity in which he seeks public office, but held that a five-year residence requirement was not necessary to achieve this purpose. In *Camara* we held that a three-year residence requirement for prospective candidates for the office of councilman in the City of Santa Cruz was not necessary to achieve a compelling state interest. Subsequent to these decisions by this court, the United States Supreme Court in *Dunn* v. *Blumstein, supra,* 405 U.S. 330, subjected a durational residence requirement of one year in the state and 90 days in the county as a prerequisite to the right to vote to the "strict scrutiny" test and concluded that it violated the equal protection clause of the Fourteenth Amendment. In *Dunn,* the high court exhaustively scrutinized durational residence requirements in order to de-

termine whether they were necessary to further the state interest of having "knowledgeable voters." Because these two fundamental rights—the right to vote and the right to be a candidate for public office—are interrelated and exert a reciprocal impact on each other and because the state interest in having knowledgeable voters and the state interest in having knowledgeable candidates coalesce, we think the *Dunn* court's reasoning is uniquely compelling in the case at bench. We, therefore, set it forth at some length.

"The argument that durational residence requirements further the goal of having 'knowledgeable voters' appears to involve three separate claims. The first is that such requirements 'afford some surety that the voter has, in fact, become a member of the community.' But here the State appears to confuse a bona fide residence requirement with a durational residence requirement. As already noted, a State does have an interest in limiting the franchise to bona fide members of the community. But this does not justify or explain the exclusion from the franchise of persons, not because their bona fide residence is questioned, but because they are recent rather than long-time residents.

"The second branch of the 'knowledgeable voters' justification is that durational residence requirements assure that the voter 'has a common interest in all matters pertaining to [the community's] government . . . .' By this, presumably, the State means that it may require a period of residence sufficiently lengthy to impress upon its voters the local viewpoint. This is precisely the sort of argument this Court has repeatedly rejected. . . .

"Similarly here, Tennessee's hopes for voters with a 'common interest in all matters pertaining to [the community's] government' is impermissible. [Fn. omitted.] To paraphrase what we said elsewhere, 'All too often, lack of a ["common interest"] might mean no more than a different interest.' *Evans* v. *Cornman,* 398 U.S., at 423. '[D]ifferences of opinion' may not be the basis for excluding any group or person from the franchise. . . .

"Finally, the State urges that a long-time resident is 'more likely to exercise his right [to vote] more intelligently.' To the extent that this is different from the previous argument, the State is apparently asserting an interest in limiting the franchise to voters who are knowledgeable about the issues. In this case, Tennessee argues that people who have been in the State less than a year and the county less than three months are likely to be unaware of the issues involved in the congressional, state, and local elections, and therefore can be barred from the franchise." *(Dunn* v. *Blumstein, supra,* 405 U.S. at pp. 354-356 [31 L.Ed.2d at pp. 291-292].)

Referring to its opinion in *Kramer* v. *Union School District* (1969) 395

U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886] in which upon application of the "strict scrutiny" test the court had struck down as violative of the equal protection clause a state law limiting the vote in school district elections to parents of school children and to property owners, the *Dunn* court continued: "Similarly, the durational residence requirements in this case founder because of their crudeness as a device for achieving the articulated state goal of assuring the knowledgeable exercise of the franchise. The classifications created by durational residence requirements obviously permit any long-time resident to vote regardless of his knowledge of the issues —and obviously many long-time residents do not have any. On the other hand, the classifications bar from the franchise many other, admittedly new, residents who have become at least minimally, and often fully, informed about the issues. Indeed, recent migrants who take the time to register and vote shortly after moving are likely to be those citizens, such as appellee, who make it a point to be informed and knowledgeable about the issues. Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election [fn. omitted], the State cannot seriously maintain that it is 'necessary' to reside for a year in the State and three months in the county in order to be knowledgeable about congressional, state, or even purely local elections. There is simply nothing in the record to support the conclusive presumption that residents who have lived in the State for less than a year and their county for less than three months are uninformed about elections. . . .

"It may well be true that new residents as a group know less about state and local issues than older residents; and it is surely true that durational residence requirements will exclude some people from voting who are totally uninformed about election matters. But as devices to limit the franchise to knowledgeable residents, the conclusive presumptions of durational residence requirements are much too crude. They exclude too many people who should not, and need not, be excluded. They represent a requirement of knowledge unfairly imposed on only some citizens. We are aware that classifications are always imprecise. By requiring classifications to be tailored to their purpose, we do not secretly require the impossible. Here, there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months. Given the exacting standard of precision we require of statutes affecting constitutional rights, we cannot say that durational residence requirements are necessary to further a compelling state interest." (*Dunn* v. *Blumstein, supra,* 405 U.S. at pp. 357-360 [31 L.Ed.2d at pp. 293-294].)

In *Young* v. *Gnoss* (1972) 7 Cal.3d 18, 27 [101 Cal.Rptr. 533, 496 P.2d

445], this court applied *Dunn* to durational residence requirements conditioning the right to vote in California and concluded that *Dunn* prohibited all durational residence requirements in excess of 30 days.

Respondent has not suggested and our attention has not been directed to any persuasive argument distinguishing, on the one hand, the reasoning of the court in *Dunn* concerning the relationship between durational residence requirements and the state interest in knowledgeable voters, and on the other, the relationship between durational residence requirements and the state interest in knowledgeable candidates. The imprecise nature of a durational residence requirement which includes uninformed old time resident candidates but excludes well informed new resident candidates is clear. It is simply too crude and imprecise an instrument to effectuate this state interest.

Under *Dunn* old time residents cannot reserve for themselves the right to vote in local elections by resorting to the technique of durational residence requirements. Neither can they limit the new residents' right to vote for candidates of their choosing by barring the latter from running for public office. Perhaps there may be some communities which in their desire to preserve the *status quo,* will attempt to impose political silence on the newcomer until he has accommodated himself to the local "scene." But new arrivals shed none of their fundamental rights by exercising their right to travel and may not be arbitrarily excluded from either a voice or a role in the affairs of their newly selected home. In these times of political and social ferment, intensified by an extraordinarily movable population, the *status quo* of the community, if worthy of preservation, must justify its continued acceptance through the free exercise of the ballot box.

In the case at bench, the City has failed to demonstrate that the election process is inadequate to weed out incompetent, unknowledgeable candidates, insensitive to, and unaware of, the best needs of the community. The hallowed belief in the wisdom and power of the electorate must not be sold short and may not be circumscribed by artificial residence barriers fencing in the right to vote or the right to be a candidate for public office.

We therefore arrive at these conclusions. Durational residence requirements for candidates for public office touch upon a fundamental interest and, therefore, must be strictly scrutinized. Having subjected to such scrutiny the two-year durational residence requirement prescribed by section 602 of the Santa Cruz City Charter, we cannot say that it is necessary to further a compelling governmental interest. We are not convinced that this provision constitutes " 'the least restrictive method of achieving the desired

purpose' "[5] of having knowledgeable candidates. We conclude that the provision denies to petitioner and other prospective candidates, falling within its reach, the equal protection of the laws.[6]

Although this disposes of the precise issue raised before us, we apprehend that it may not lay the problem to rest. After we struck down in *Camara* the City's *three*-year durational residence requirement found in former section 602, the City merely modified the section to substitute a *two*-year requirement. We now feel similarly constrained to find that requirement unconstitutional. It would seem likely that the City may respond by further changing section 602 so as to prescribe a requirement of *less* than two years, indeed possibly *slightly less* than two years. Under the circumstances we feel under an obligation to express our views as to the constitutional limits of such requirements so that legislative bodies may be guided accordingly.

Applying to this constitutional problem the rationale of *Dunn* v. *Blumstein, supra,* and of our own decision in *Young* v. *Gnoss, supra,* we are of the opinion that where, as in the instant case, a public entity conditions the right to be a candidate for public office on residence therein, the entity may constitutionally require that the prospective candidate be a resident at the time he files his nominating papers or equivalent declaration of candidacy and for a period of not more than 30 days next preceding such date of filing. We are of the view that any durational residence requirement in excess of the foregoing is violative of the equal protection of the laws. We observe that in *Dunn* and *Young* which dealt with durational residence requirements for the exercise of the right to vote, the critical date was the date of the election. In situations like the instant one, however, dealing with such requirements for the exercise of the right to be a candidate for public office, the critical date is the date of filing nominating papers or other declaration of candidacy since there is an obvious governmental interest in requiring the candidates to be residents throughout the entire election process.[7]

Let a peremptory write of mandate issue directing respondent city clerk

---

[5]*Westbrook* v. *Mihaly, supra,* 2 Cal.3d at page 785.

[6]In *Lindsey* v. *Dominguez* (1933) 217 Cal. 533 [20 P.2d 327], this court upheld a two-year residence requirement for the office of city councilman, but did not reach the constitutional issue now before us. In *Wenke* v. *Hitchcock, supra,* 6 Cal.3d 746, we partially overruled *Lindsey*. To the extent that *Lindsey* is inconsistent with our ruling here, that case is overruled.

[7]For example, in the present case, the municipal election is to be held on April 10, 1973, and the nominating papers must be filed no later than February 1, 1973. Thus a charter requirement of the City that all prospective candidates be residents for at least 30 days next preceding the filing of nominating papers could permissibly have the effect of prescribing durational residence for a period of at least 98 days prior to the coming election.

to file petitioner's nomination papers and to place his name upon the ballot for the municipal election of April 10, 1973, if he complies with all other requirements for becoming a candidate for City Councilman of the City of Santa Cruz. This order is final forthwith.[8]

Tobriner, J., concurred.

**WRIGHT, C. J., and MOLINARI, J.**[*]—We concur in the judgment insofar as it holds that the two-year durational residence requirement prescribed by section 602 of the Santa Cruz City Charter is invalid as it denies to petitioner the equal protection of the laws.

**MOSK, J.**—I concur in the judgment.

While I approve the majority opinion in general, I would more elaborately address what I believe to be the underlying problem, and would rely on state constitutional grounds to reach the result.

For several years this court has been groping for an acceptable formula in the murky waters of durational residence requirements for political candidacy (*Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716 [94 Cal.Rptr. 602, 484 P.2d 578], and *Camara* v. *Mellon* (1971) 4 Cal.3d 714 [94 Cal.Rptr. 601, 484 P.2d 577]). Political entities, navigating in our wake, have made similar attempts. That all such formulae, however rationalized, will founder when challenged in judicial proceedings seems preordained. And, indeed, all such durational residential requirements should be rejected because they can be justified solely on a paternalistic theory that the citizens of yesterday know what is best for the governance of the citizens of today and tomorrow. This is at variance with enlightened principles of democracy and self-government.

There are three available alternatives. First, we can approve every residence requirement adopted by political entities on a theory that self-imposed restrictions upon local government are inviolate. Thus if a self-perpetuating community "establishment" determines that two years' residence—or three, or five, or ten years—is necessary before candidates can acquire knowledge of the problems of the community, the judiciary must reject a challenge brought by a "newcomer" who may have been in the community one—or two, four or nine years—regardless of his actual knowledge of governmental problems. Our court unanimously rejected

---

[8]This paragraph confirms our order in identical language filed on February 23, 1973.

[*]Assigned by the Chairman of the Judicial Council.

this theory when we struck down a five-year requirement in *Zeilenga* and a majority agreed in invalidating a three-year period in *Camara.*

The second alternative is to selectively approve or disapprove durational requirements as they are presented to us case by case. Up to now this has been our approach, but I suggest it has proved long on expenditure of judicial resources and short on wisdom. When the three-year period adopted by Santa Cruz was rejected in *Camara* the administration there proposed a two-year period. Since that now becomes invalid, as the majority notes, the city, if undeterred, may conceive a new proposal of something less than two years. Vagueness of permissible limits only assures future litigation.

More significant in this problem, however, has been the absence of objective criteria. Five years was invalidated in *Zeilenga* because the members of this court subjectively determined that the period was too long. For the same reason a majority found three years improper in *Camara,* over the dissent of three justices who would have approved that requirement. Here the dissent would approve a two-year rule. In the same manner recently a three-judge federal court in *Walker* v. *Yucht* (D.Del. 1972) 352 F.Supp. 85, divided on what the judges deemed "reasonable" durational residency requirements. Since there are no visible signposts, all these individual conclusions were apparently reached via a visceral route.

The third alternative, now substantially adopted by the majority, would reestablish the predictability which is the hallmark of a responsible judicial system, and at the same time assure maximum participation in the electoral process. Logic dictates a result which equates the right to vote with the right to seek public office. Any citizen qualified to vote in a jurisdiction should be entitled to seek public office in that jurisdiction, assuming in appropriate instances he possesses the required professional qualifications (e.g., only a member of the bar may seek the office of district attorney). If he has the knowledge essential to vote intelligently, in general he will have the knowledge to serve his community in elective office. However, if his fellow citizens believe he lacks the capability to serve, their remedy is to reject his candidacy at the ballot box.

We cannot be so naive as to believe absence of durational residence requirements will automatically catapult uninformed candidates into public office. Inevitably time in the jurisdiction will be a significant issue in local political campaigns. The "life-long resident" of a community will tout his superior familiarity with the problems of the area. The recent settler will assuredly be faced with the charge he is an interloper or carpetbagger. In

most instances the candidate well tutored in community problems will be better known by the electorate and will prevail. But if the voters exercise their franchise to reject the life-long resident, and prefer to be represented by the newcomer, restraints imposed by a past citizenry, presumably to prevent future folly, should not be permitted to thwart such democratically determined result.

Where I part with the majority opinion is in its total reliance upon *Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995]. We faithfully followed *Dunn* in *Young* v. *Gnoss* (1972) 7 Cal.3d 18 [101 Cal.Rptr. 533, 496 P.2d 445], since a similar factual issue was involved, and thus grounded that state decision on federal constitutional grounds. While *Dunn* is analytically helpful here, I prefer to invoke article I, section 21, of the California Constitution, which provides that no "citizen, or class of citizens be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens." This section of our state Constitution, binding upon counties and cities, including charter cities (*Acton* v. *Henderson* (1957) 150 Cal.App.2d 1, 18 [309 P.2d 481]), has long been applied to invalidate discriminatory legislation involving the right to seek political office (*Murphy* v. *Curry* (1902) 137 Cal. 479 [70 P. 461]; *Britton* v. *Board of Commrs.* (1900) 129 Cal. 337 [61 P. 1115]; *Eaton* v. *Brown* (1892) 96 Cal. 371 [31 P. 250]), and seems particularly appropriate in this case, where those who have resided in the community for more than two years are granted privileges denied to citizens who have resided therein a lesser period.

I also disagree with the majority's dictum on the date from which the qualification to seek office should be measured. *Dunn* and *Young* declared the critical point on the right to vote to be the date of election. Here, without any citation of authority, the majority purport to create a new requirement: one must be qualified at the time of filing nominating papers or other declaration of candidacy.

The United States Constitution requires senators to be 30 years of age and they must *when elected* be an inhabitant of their state (art. I, § 3, cl. 3). Obviously they need not be inhabitants when they merely declare for office. In actual practice the qualifications during candidacy have been irrelevant. For example, in modern times two senators were 29 when elected and only reached the constitutionally required age prior to taking their oath of office. (Senator Rush Holt, West Virginia, elected in 1934, and Senator Joseph Biden, Jr., Delaware, elected in 1972.) The crucial times being the election or assumption of office for United States Senators, either date would seem to suffice for city councilmen in Santa Cruz.

The majority refer to the "hallowed belief in the wisdom and power of the electorate." I have consistently maintained that in the final analysis the only solution to qualifications problems is to repose faith in the electoral process. One of the first members of the United States Supreme Court, Justice James Iredell, saw the issue remarkably well in *Fries Case* (D.Pa. 1799) 9 Fed.Cas. No. 5126: "All systems of government suppose they are to be administered by men of common sense and common honesty. In our country, as all ultimately depends on the voice of the people, they have it in their power, and it is to be presumed they generally will choose men of this description; but if they will not, the case, to be sure, is without remedy."

**BURKE, J.**—I dissent. In *Zeilenga* v. *Nelson,* 4 Cal.3d 716 [94 Cal.Rptr. 602, 484 P.2d 578], and *Camara* v. *Mellon,* 4 Cal.3d 714 [94 Cal.Rptr. 601, 484 P.2d 577], this court struck down candidate residence requirement provisions of *five* years and *three* years duration respectively. Although I concurred in *Zeilenga,* I dissented in *Camara* (joined by Chief Justice Wright and Justice McComb) on the basis that although a five-year requirement appeared to be arbitrary and capricious, a three-year requirement probably fell within reasonable limits, given recognition to the constitutional home rule rights of charter cities to fashion their local governments as electors of such entities deem best and the legitimate interests underlying candidate residence requirements. In the instant case, obedient to our mandate in *Camara,* the voters of the City of Santa Cruz discarded the three-year requirement in its charter and adopted a *two*-year requirement. Now, the majority not only strike down this two-year provision, they also announce the invalidity of *any* candidate residence requirement in excess of 30 days. In my view, this extreme holding is totally unjustified. Residential qualifications for election to local public office perform legitimate and compelling public interests which would warrant our upholding the two-year residence requirement at issue as a valid exercise of the City's own constitutional right to control its municipal affairs.

Initially, we must determine what standard governs in measuring the constitutionality of various restrictions imposed upon the right to run for public office. The latest pronouncement of the United States Supreme Court indicates that the traditional "rational basis" test may be sufficient in the absence of a discrimination based upon wealth or some other "suspect" classification. (See *Bullock* v. *Carter,* 405 U.S. 134, 142-144 [31 L.Ed.2d 92, 99-100, 92 S.Ct. 849], applying a "close scrutiny" test to invalidate a Texas filing fee scheme which tended to exclude from the ballot candidates unable to afford the substantial fees at issue therein.) The residence requirement at issue may operate to restrict the field of candidates from which

voters might choose, but, as stated in *Bullock,* "The existence of such barriers does not of itself compel close scrutiny." (*Id.* at p. 143 [31 L.Ed.2d at p. 100].)

Even if we asume, *arguendo,* that a close scrutiny standard applies, that standard is one of *reasonable* necessity. Again, as stated in *Bullock,* the provision at issue "must be 'closely scrutinized' and found *reasonably necessary* to the accomplishment of legitimate state objectives in order to pass constitutional muster." (405 U.S. 134, 144 [31 L.Ed.2d 92, 100]; italics added.) The majority, I fear, wholly ignore this rule of reason in testing the validity of the charter provision under scrutiny herein. (See, e.g., p. 102, lines 24-28, *ante.*) As I will demonstrate, however, there do exist legitimate interests underlying the requirement that a candidate for public office be a resident of the municipality for a reasonable period of time prior to the election, and the residence requirement is indeed "reasonably necessary" to promote those interests. Accordingly, whether we apply the "rational basis" test or the "close scrutiny—reasonably necessary" standard, we should uphold the constitutionality of the provision at issue in this case.

First of all, it seems evident that a municipality has the constitutional authority in controlling municipal affairs and exercising its "home rule" powers (see Cal. Const., art. XI, §§ 5, 7), to designate the qualifications of candidates for public office, including the requirement that candidates have a minimum degree of familiarity with local conditions, problems and issues. As this court stated in *Lindsey v. Dominguez,* 217 Cal. 533, 535 [20 P.2d 327], "The City has the undoubted right and power to fix reasonable restrictions upon the right to hold office under its charter." Certainly no one could contend with conviction that a municipality has no legitimate interest whatever in taking reasonable measures to assure that knowledgeable candidates appear on the ballot. In the light of the lack of feasible alternative provisions,[1] a residence requirement appears *reasonably* necessary to promote that interest. True, a new resident/candidate conceivably could gain familiarity with local problems by intensive study and research of his new locale, and a long-time resident/candidate may lack such familiarity altogether, but the residence requirement is *generally* the most practical assurance of a candidate's minimum qualifications in this regard. None of the cases cited by the majority requires absolute precision in this area; as explained above, only a "reasonable necessity" must be shown.

The majority state that "City has failed to demonstrate that the election process is inadequate to weed out incompetent, unknowledgeable candi-

---

[1]Neither the municipality, its taxpayers nor the candidates themselves should be put to the inconvenience and expense of undertaking a pre-election test of the candidate's local knowledge.

dates . . . ."[2] Yet, as the majority must know, the inadequacy of the election process is something wholly incapable of objective proof. Rather than require our municipalities to meet an impossible standard of proof, we should acknowledge their authority to take reasonable measures to enhance the value of the democratic process by affording additional protection to voters against unknowledgeable or fraudulent candidates.

Additionally, a municipality should be permitted to conclude that its voters are entitled, to a reasonable extent at least, to have some firm basis for judging the character and ability of the candidates appearing on the ballot. A residence requirement affords local voters some opportunity to familiarize themselves with, and either develop confidence in or reject, particular candidates. In fact, a candidate's dealings with the public in prior business, civic, charitable, social, or other local affairs often provide the only opportunity for voter-candidate contact in a noncampaign atmosphere. Of course, it is conceivable that some new resident/candidates may, by intensive campaigning, obtain a degree of exposure to the voters, and some old resident/candidates may not, but these are exceptions which do not militate against the validity of the requirement in its general application. Perfect precision is not required—only "reasonable necessity." The majority do not even acknowledge the existence of a legitimate interest of municipalities in promoting voter-candidate contact, much less do they reach the question whether a residence requirement is a reasonable means of promoting that interest.

Thus, despite the majority's assertion that a residence requirement is too "crude and imprecise" to serve as a proper means of promoting legitimate municipal goals, the majority wholly fail to suggest any conceivable alternative procedures to accomplish the twin purposes described above. In my view, the City's two-year residence requirement seems reasonably suited to assure that local candidates are familiar with local problems and have had some exposure to local voters; and frankly, I cannot imagine a more objective, precise, less intrusive means of accomplishing those purposes.

Indeed, a recent federal case has upheld a *three*-year durational residence requirement for candidates for election to the general assembly in Delaware. The court determined that the "rational basis" test applied and acknowledged not only the state's interest in promoting knowledgeable

---

[2]The majority perhaps overlook the fact that it was the "election process" itself which created the residence requirement in City's charter. Are not the voters entitled to enact self-protective measures to obtain a qualified slate of candidates? In the very words of the majority, "The hallowed belief in the wisdom and power of the electorate must not be sold short . . . ."

candidates but also the additional interest in familiarizing the voters with those candidates. (*Walker* v. *Yucht* (D.Del. 1972) 352 F.Supp. 85 [three-judge court]; see also *Draper* v. *Phelps* (W.D.Okla. 1972) 351 F.Supp. 677 [three-judge court, acknowledging both interests to uphold a six-month residence requirement]; *State* ex rel. *Gralike* v. *Walsh* (Mo. 1972) 483 S.W.2d 70 [upholding one-year residence requirement].)

The majority's reliance upon *Dunn* v. *Blumstein,* 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995], seems wholly misplaced. That case involved the validity of residence requirements for *voters,* not candidates, and reached the conclusion that municipalities cannot require voters to be long-time residents to promote some vague purpose to achieve a more intelligent electorate. Unquestionably, the court was greatly troubled in *Dunn* by the fact that the voter residence requirement tended to exclude many voters who were wholly qualified to exercise their franchise. But although a residence requirement may be ill-suited as a *voter*-qualification device, its value as applied to *candidates* seems unquestioned. Any person with rudimentary awareness of issues and candidates can cast his ballot, and an uninformed vote is easily cancelled by an intelligent one. But voters are not responsible for managing civic affairs and making the day-to-day decisions which municipal officials must face. Surely a significant distinction exists between the law under attack here, and the provision held invalid in *Dunn.* As this court pointed out many years ago in *Lindsey* v. *Dominguez, supra,* 217 Cal. 533, 535, in upholding a similar two-year residence requirement in the Los Angeles City Charter, "The right to vote and the right to hold office are independent matters. This is evidenced in Constitutions and statutes, both national and state."

Indeed, residence requirements for candidates for public office play an important role in our state and federal constitutional schemes. For example, the President of the United States must have been a *fourteen*-year resident in this country (U.S. Const., art. II, § 1, cl. 5), a United States Senator a *nine*-year resident (*id.,* art. I, § 3, cl. 3), a United States Representative a *seven*-year resident (*id.,* art. I, § 2, cl. 2). The Governor of California must have been a resident of California for *five* years (Cal. Const., art. V, § 2), the Lieutenant Governor a resident for *five* years (*id.,* art. V, § 9), and a member of the state Legislature a resident for *three* years (*id.,* art. IV, § 2, subd. (c)). Are these various *constitutional* provisions themselves unconstitutional because too "crude and imprecise"?

I should also point out that for general law cities there exists a one-year residence requirement for persons seeking to hold office as city councilman,

clerk or treasurer. (Gov. Code, § 36502.) An identical provision exists with respect to candidates for county boards of supervisors. (Gov. Code, § 25041.) We referred to this latter provision with implicit approval when we struck down the five-year requirement in Butte County. (*Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716, 722 ["The difficulty of making such a showing (of compelling necessity for a five-year requirement) seems self-evident when one realizes that as to general law counties the residence requirement is only one year."].) Thus, it is apparent that the Legislature has weighed the various competing considerations and has determined that, on balance, a one-year requirement is reasonable in the absence of contrary charter provision. Under the majority's holding, however, these statutory provisions likewise are declared too "crude and imprecise" to withstand constitutional scrutiny, even though they represent the careful judgment of the Legislature.

Counsel for respondent lists 32 chartered cities and their respective residence requirements of which:

Three require five years.

Two require four years.

Twelve require three years.

Four require two years.

Eight require one year.

One (Berkeley) requires qualification as an elector.

One (San Jose) requires qualification as a resident elector.

One (Monterey) has no residence requirement.

Out of this list (which is only a sampling but includes at least all the larger cities) 21 require two or more years, eight require one year, and only three less than one year. This sampling clearly establishes the belief of the voters of these cities that some substantial residential requirement is essential to qualify as a nominee for membership on the local governing board. Yet our court majority evidently refuses to acknowledge that these provisions perform valuable functions in promoting legitimate interests of these municipalities and their voters.

I would uphold the City's two-year provision as reasonably necessary to promote legitimate municipal objectives. A fortiori I would uphold the one-year requirement chosen by the Legislature. Certainly a lesser period

would be wholly inadequate to protect and promote the interests discussed above.

McComb, J., concurred.