[Civ. No. 41810. First Dist., Div. Four. Mar. 21, 1978.]

BAY AREA WOMEN'S COALITION et al.,
Plaintiffs and Respondents, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Appellant.

**COUNSEL**

Thomas M. O'Connor, City Attorney, and Burk E. Delventhal, Deputy City Attorney, for Defendant and Appellant.

Morton P. Cohen for Plaintiffs and Respondents.

## OPINION

**WILSON, J.**\*—Defendant-appellant City and County of San Francisco (hereafter City) appeals from an order granting a preliminary injunction restraining enforcement of the five-year durational residency requirement provided in the city charter for persons appointed to boards and commissions of the City.

### FACTS

Respondents, who are members of an association ·interested in the participation of women in public affairs, brought the instant suit against the City. Each respondent alleged in the complaint that she sought consideration for appointment to a San Francisco board or commission but has been precluded therefrom by administrative application of section 8.100(a) of the charter.[1] Each of the individual respondents is a taxpayer and resident of the City, but failed to qualify for consideration for appointive office because she had not met the five-year durational residency requirement. It was also alleged that respondents "have had intentions of traveling and residency elsewhere than in San Francisco in order to obtain work and education experience," but have had their intentions "chilled" and have been discouraged from applying due to the existence of section 8.100.

Respondents also filed a declaration of the Mayor of San Francisco, George Moscone, which stated that the five-year residency requirement of section 8.100(a) "operates to limit the potential of qualified candidates" for appointment to various boards and commissions and "constitutes an unnecessary and harmful restriction upon the appointment of important public officials."

---

\*Assigned by the Chairperson of the Judicial Council.

[1]That section (hereinafter section 8.100(a)) provides: "No person shall be a candidate for any elective office nor shall be appointed as a member of any board or commission unless he shall have been a resident of the city and county for a period of at least five years and an elector thereof for at least one year immediately prior to the time of his taking office, unless otherwise specifically provided in this charter, and every elected officer and member of any board or commission shall continue to be a resident of the city and county during incumbency of office, and upon ceasing to be such resident, shall be removed from office."

After the Supreme Court decision in *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716 [94 Cal.Rptr. 602, 484 P.2d 578], the city attorney notified the registrar of voters that the five-year residency requirement could no longer be validly applied to candidates for elective office. Later, however, the city attorney stated that *Zeilenga* did not apply to appointive offices. (Opn. of the City Attys., Nos. 71-91, 74-54 (1974).)

The complaint sought a declaration that the subject durational residency requirement was unconstitutional, along with preliminary and permanent injunctions restraining the enforcement thereof. Accompanying the complaint was a motion for preliminary injunction which was opposed by the City.

On March 26, 1977, the superior court granted the motion and enjoined enforcement of the challenged provision, stating: "In making this determination and granting the preliminary injunction, the Court finds that under either the 'strict scrutiny' or 'rational basis' tests, Charter Section 8.100 requiring a five year duration residency is arbitrary and unreasonable."

## DISCUSSION

### Is city charter section 8.100 unconstitutional as a denial of equal protection of the law?

■ Section 8.100(a) insofar as it is here applicable,[2] sets up as a prerequisite for appointment to a board or commission of the City, the qualification that an individual must have been a City resident for a period of at least five years. The effect of this charter provision is to impose what is commonly referred to as a "durational residency" requirement, dividing residents into two classes, old residents and new residents. It discriminates against the latter to the extent of totally denying them candidacy for appointive office. The question presented here is whether such a classification denies new residents equal protection under law as guaranteed by the Fourteenth Amendment to the United States Constitution.

■ The primary step in our analysis is to determine under which standard of review the present classification must be judged. In considering laws challenged under the equal protection clause, the United States Supreme Court has applied either the "rational basis" test or the "strict scrutiny" (also referred to as the "compelling state interest") test, depending upon the interest affected or the classification involved. (*Dunn* v. *Blumstein* (1972) 405 U.S. 330, 335 [31 L.Ed.2d 274,

---

[2]It should be noted at the outset that respondents have only challenged that portion of section 8.100 which imposes a five-year *durational* residence requirement, not the portion which requires that appointees to boards or commissions be *concurrent* residents of the City.

280, 92 S.Ct. 995].) The latter test will be employed in cases involving "suspect classifications" or where the challenged legislation adversely affects "fundamental interests"; otherwise the former test will prevail. (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].)

■ It can be seen immediately that new residents do not comprise a "suspect class." Such a group must be one which has been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment" as to justify extraordinary protection. (See *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 28 [36 L.Ed.2d 16, 40, 93 S.Ct. 1278].) No federal or state decision has ever viewed the status of new residency as included within this category.

■ In *Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716, the California Supreme Court held that a county charter provision which imposed a five-year residency requirement on all candidates for board of supervisors to be unconstitutional as a denial of equal protection. In so doing, the court applied the "strict scrutiny" test because of the fundamental nature of the right to hold public office: " '[T]he right to hold public office, *either by election or appointment,* is one of the valuable rights of citizenship.' (*Carter* v. *Commission on Qualifications of Judicial Appointments* (1939) 14 Cal.2d 179, 182 [93 P.2d 140].) It is a 'fundamental right' (*Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 335 [38 Cal.Rptr. 625, 392 P.2d 385]) which the First Amendment protects against infringement (*Johnson* v. *State Civil Service Department* (1968) 280 Minn. 61 [157 N.W.2d 747, 750]; *Minielly* v. *State* (1966) 242 Ore. 490 [411 P.2d 69, 73, 28 A.L.R.3d 705]). There is 'a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications.' (*Turner* v. *Fouche* (1970) 396 U.S. 346, 362 [24 L.Ed.2d 567, 580, 90 S.Ct. 532].)" (4 Cal.3d at pp. 720-721, italics added.)

However, the continued viability of the quoted language, insofar as it implies that the right to hold public office is a "fundamental" right under the United States Constitution, is open to some question. In *Bullock* v. *Carter* (1972) 405 U.S. 134 [31 L.Ed.2d 92, 92 S.Ct. 849], the United States Supreme Court declined to hold that the right to aspire to public office was fundamental in nature. Nevertheless, the court held that the Texas procedure for imposing substantial filing fees on candidates for

primary nominations must be subjected to the "strict scrutiny" test, because of its impact on the rights of voters.

The court found that the size of the required filing fees[3] reflected their "patently exclusionary character," (*id.,* at p. 143 [31 L.Ed.2d at p. 100]) thereby limiting voters in their choice, particularly less affluent voters whose favorites might not qualify. Strict scrutiny was required "[b]ecause the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate . . . ." (*Id.,* at p. 144 [31 L.Ed.2d at p. 100].)

Subsequently, in *Thompson* v. *Mellon* (1973) 9 Cal.3d 96 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029], the California Supreme Court struck down a city charter provision prescribing a two-year durational residency requirement on candidates for public office. The court discussed *Bullock* at some length and concluded that its essential holding was "that restrictions upon candidacy for public office which excluded a significant group of potential candidates from the ballot must be 'closely scrutinized.' " (*Thompson, supra,* 9 Cal.3d at p. 100.) This would be so irrespective of whether the restriction had particular impact on "minority economic or political groups." (*Id.,* at p. 101.)

Obviously, restrictions on eligibility for appointive office do not have the impact on the right to vote which characterizes restrictions on eligibility for elective office. Nor, in view of *Adams* v. *Superior Court* (1974) 12 Cal.3d 55 [115 Cal.Rptr. 247, 524 P.2d 375], can we take the position that all durational residency requirements, regardless of their impact, are to be subjected to the strict scrutiny test. In *Adams* the court upheld a one-year residency requirement for jury duty.

However, in *Thompson, supra,* 9 Cal.3d 96, the California Supreme Court found an entirely new and independent basis for applying the strict scrutiny test in analyzing durational residency

---

[3]The fees were fixed by the county executive committee of the particular political party; were payable to the committee; were required to be based on " 'the importance, emolument, and term of office for which the nomination is to be made' " (405 U.S. at p. 138 [31 L.Ed.2d at p. 97]); and were for the purpose of paying the costs of the primary election. The fee for filing as a candidate for county judge, to which office plaintiff Wischkaemper aspired, was $6,300, representing 32 percent of the annual salary for that office.

requirements—namely, the penalizing effect that such restrictions have upon the fundamental right to travel. (9 Cal.3d at pp. 101-102.)

In *Dunn* v. *Blumstein, supra,* 405 U.S. 330, relied upon by *Thompson,* the United States Supreme Court made it clear that durational residence requirements directly impinge upon the personal right of travel, which has been recognized as a fundamental constitutional right. *(Id.,* at pp. 338-339 [31 L.Ed.2d at pp. 281-282]; see *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 629-631 [22 L.Ed.2d 600, 612-613, 89 S.Ct. 1322].) "Obviously, durational residence laws single out the class of bona fide state and county residents who have recently exercised this constitutionally protected right, and penalize such travelers directly." (405 U.S. at p. 338 [31 L.Ed.2d at p. 282].) Accordingly, the California Supreme Court in *Thompson* pointed out that this classification is alone sufficient to require application of the strict scrutiny test. (9 Cal.3d at pp. 101-102; see *Green* v. *McKeon* (6th Cir. 1972) 468 F.2d 883, 884-885.)

█ The City argues that the right to travel is not impaired by its durational residency requirement because a person's motive to travel "could hardly be affected" by section 8.100(a), and that the present requirement was not *intended* to prevent respondents from moving from one place to another. This is the precise view which the United States Supreme Court has characterized as "a fundamental misunderstanding of the law." *(Dunn, supra,* 405 U.S. at p. 339 [31 L.Ed.2d at p. 283].) The court explained that whether a statute seeks to or actually does deter travel is irrelevant: rather, the compelling state interest test is triggered whenever the classification serves to *penalize* the exercise of that right. *(Id.,* at pp. 339-340 [31 L.Ed.2d at pp. 282-283].) In the present case, it is abundantly clear that section 8.100(a) has a penalizing effect on those who have recently exercised their right to travel by barring them from appointment to public office.

█ We therefore conclude that the durational residency requirements sought to be imposed by the City in this case upon the right to seek appointive office must be judged by the "strict scrutiny" test.

We find nothing in *Adams* v. *Superior Court, supra,* 12 Cal.3d 55, which requires a contrary conclusion. In *Adams,* a bare majority of the California Supreme Court found that a one-year residency requirement for jury duty should not be subjected to the stricter test since "any penalizing effect of the durational residency requirement is inconsequen-

tial." (*Id.*, at p. 62.) It is evident, however, that this conclusion was arrived at due to the minimal importance which the court ascribed to an individual's interest in serving on a jury: "The guarantee of the Sixth Amendment is primarily for the benefit of the litigant—not persons seeking service on the jury; and even though lawfully qualified, a citizen may not demand to serve on a jury. At most, the citizen is entitled to be considered for jury service. His interest in becoming a juror is clearly secondary to the interests of the litigants in securing an impartial jury, as shown by the traditional exclusion of prospective jurors for cause or upon peremptory challenge. Jury service is commonly viewed more as a combination of duty and privilege than as a right, sanctions being imposed for failure to appear. (Code Civ. Proc., § 238.)" (12 Cal.3d at p. 61.)

The City argues that only where durational residency requirements impose a penalty by invoking a denial or delay of access to basic necessities or a fundamental right found explicitly set forth in the Constitution, should they be subjected to the strict scrutiny test. However, if this were so it would be unnecessary to conclude, as did the Supreme Court in *Thompson, supra,* 9 Cal.3d 96, that impinging on the right to travel, in itself, may constitute an independent basis for the application of the stricter standard. The test is not whether the penalty imposed on the right to travel is the denial of a fundamental right, such as access to basic necessities or the right to vote. Instead, the test is whether the penalty is significant and consequential, rather than merely inconsequential as was the case in *Adams, supra,* 12 Cal.3d 55.

While it may not be fundamental in the constitutional sense, in *Zeilenga,* the Supreme Court termed the right to hold public office, either elective or appointive, "one of the valuable rights of citizenship" and one which the First Amendment protects against infringement. (4 Cal.3d at p. 720.) In this context, the penalizing effect of section 8.100(a) on persons exercising their right to travel cannot be called "inconsequential," for it deprives new residents of a right of fundamental importance —i.e., that of participating in the governmental decision-making processes of their own boards and commissions. While this right may not have a direct impact on the fundamental right to vote, as does the right to run for elective office, it is obviously more significant, both to those seeking such offices and to those who would be served by them, than is the opportunity to be included in a pool of citizens from which prospective jurors are to be summoned.

, In order to meet the "strict scrutiny test" the City must establish that the durational residency requirements are reasonably necessary to promote a compelling governmental interest. Measured by this test these requirements cannot be upheld, and the City concedes this in its brief.

The test, as it applies to such residence requirements, is well articulated by the United States Supreme Court in *Dunn* v. *Blumstein, supra,* 405 U.S. 330 at page 343 [31 L.Ed.2d 274 at page 285]: "It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' [citations] and must be 'tailored' to serve their legitimate objectives. [Citation.] And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' "

, In the instant case, the City sets forth as its interest, to "insure that those individuals charged with the administration of public affairs would not only be acquainted with the city and its affairs but also would have a vested interest in the quality of their work product."

The argument that a durational residency requirement is necessary to further a compelling governmental interest in insuring a knowledge and understanding of local issues has been repeatedly rejected by the California Supreme Court. (*Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716, 722; *Thompson* v. *Mellon, supra,* 9 Cal.3d 96, 104-105; *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 470 [125 Cal.Rptr. 129, 541 P.2d 881].) As stated in *Johnson, supra,* "[i]n terms of the education of the candidate, the argument that an extended residence is necessary for an understanding of local issues, while perhaps appealing in the abstract, nonetheless ignores the hard realities bearing on the relationship of candidate and issue. The knowledge, appreciation, and comprehension of the public issues and problems which a candidate either possesses or may reasonably be expected to acquire are so much the product of the variables of motivation, intelligence, maturity, experience, opportunity, and desire as to make any flat rule of physical residence appear immediately suspect and arbitrary. The congeries of individual capacities for observation, study, exposure, and growth are simply so different as to be inhospitable

to a rigid fixed qualification tied to residence." (15 Cal.3d at p. 470.) There is no material distinction in this respect between candidates for elective as opposed to appointive office. "The imprecise nature of a durational residence requirement which includes uninformed old time resident candidates but excludes well informed new resident candidates is clear. It is simply too crude and imprecise an instrument to effectuate this state interest." (*Thompson, supra,* 9 Cal.3d at p. 105.)

Nor can the five-year residence requirement be justified as necessary to insure that an appointee have a "vested interest" in the performance of his or her job. The concurrent residence requirement already contained in section 8.100 provides, among other methods, a less drastic means of accomplishing the same objective.

In summary, it appears that the five-year durational residence requirement of section 8.100(a) is not justified as furthering any compelling governmental interest, nor does it constitute the " 'least restrictive method of achieving the desired purpose.' " (*Westbrook* v. *Mihaly, supra,* 2 Cal.3d at p. 785.) We thus conclude that the provision denies respondents and other candidates for appointive office similarly situated, the equal protection of the laws. The order of the lower court restraining the enforcement of this requirement was proper.

Affirmed.

Caldecott, P. J., and Christian, J., concurred.