[No. A018991. First Dist., Div. Two. Aug. 22, 1984.]

LAURENCE J. RITTENBAND et al., Plaintiffs and Appellants, v.
KENNETH CORY, as State Controller, et al.,
Defendants and Respondents.

COUNSEL

Feldman, Waldman & Kline, Richard L. Jaeger, Paul J. Dion, Deborah M. Lauter, Levine, Krom & Unger and Leonard Unger for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Eugene Hill, Assistant Attorney General, Harold Teasdale and Caren C. Dorshkind, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**KLINE, P. J.**—This case presents a constitutional challenge to the use of age as a proxy for judicial competence.

Plaintiffs, who are California judges suing on behalf of themselves and all other judges similarly situated,[1] appeal from a judgment upholding the

---

[1] As set forth in the complaint, "[t]he class which plaintiffs represent is composed of every Justice of the Supreme Court and Courts of Appeal, and every Judge of the Superior and Municipal Courts now serving, whose term of office has extended or will exceed beyond the 70th birthday of that Justice or Judge and who will receive a reduction in pension benefits by virtue of having remained in office past the age of 70."

constitutionality of article 3.6 of the Judges' Retirement Law (Gov. Code, §§ 75075-75079),[2] which encourages judges to retire at or before age 70 by providing reduced retirement benefits to judges choosing to retire after age 70 and to their surviving spouses.

Plaintiffs challenge the statute on equal protection grounds, contending that it impermissibly infringes on assertedly fundamental rights to seek and hold elective office, to vote, and to pursue a lawful occupation; that it unconstitutionally conditions the receipt of pension benefits upon the relinquishment of those fundamental rights; and that even were fundamental rights not at issue, the statute violates equal protection as its age based classification is not rationally related to a legitimate state purpose.

STATEMENT OF THE CASE

In rendering judgment for defendants State Controller and the Public Employees Retirement System the trial court, sitting without a jury, specifically concluded that the provisions of article 3.6 of the Judges' Retirement Law do not violate the equal protection clause of the California Constitution, and that strict scrutiny was not required as the law neither involves a suspect classification nor impairs any fundamental rights. Applying the standard of minimal rationality, the court found that in adopting article 3.6 the Legislature's primary purpose was to encourage judges to retire at or before age 70 and thereby prevent a superannuated judiciary. The trial court held that the statute "serves the legitimate state purpose of maintaining the competency and work capacity of the judiciary."

FACTS

California law, unlike that of several of our sister states,[3] does not provide for the mandatory retirement of judges. Our Constitution simply directs the

---

[2]All statutory references herein are to the Government Code unless otherwise indicated. The Judges' Retirement Law consists in its entirety of chapter 11 of that code, commencing with section 75000.

[3]See, e.g., the Pennsylvania, Illinois, Missouri, New York, Vermont, Utah and Idaho judicial retirement systems that were respectively reviewed in *Malmed* v. *Thornburgh* (3d Cir. 1980) 621 F.2d 565, certiorari denied 449 U.S. 955 [66 L.Ed.2d 219, 101 S.Ct. 361]; *Trafelet* v. *Thompson* (7th Cir. 1979) 594 F.2d 623, cert. den., 444 U.S. 906 [62 L.Ed.2d 142, 100 S.Ct. 219]; *O'Neil* v. *Baine* (Mo. 1978) 568 S.W.2d 761; *Rubino* v. *Ghezzi* (2d Cir. 1975) 512 F.2d 431, certiorari denied 423 U.S. 891 [46 L.Ed.2d 122, 96 S.Ct. 187]; *Aronstam* v. *Cashman* (1974) 132 Vt. 538 [325 A.2d 361]; *Nelson* v. *Miller* (1971) 25 Utah 2d 277 [480 P.2d 467]; and *Boughton* v. *Price* (1950) 70 Idaho 243 [215 P.2d 286].

Legislature to "provide for retirement, with reasonable allowance, of judges of courts of record for age or disability." (Cal. Const., art. VI, § 20.)

"In 1953 the present Judges' Retirement Law was adopted, which provided an allowance for a retiring or disabled judge of half the salary of his office. (Gov. Code, § 75032.) No allowance was provided for a surviving spouse. Later that year a provision was added allowing a retiring or disabled judge to apply the actuarial equivalent of his retirement allowance to a lesser optional settlement payment to the judge for life and thereafter to his surviving spouse for life. (Gov. Code, §§ 75070, 75071.)" (*McCourtney* v. *Cory* (1981) 123 Cal.App.3d 431, 435 [176 Cal.Rptr. 639].[4]

Eligibility to retire for age and service begins at age 60 with 20 years of service credited. The length of service required for retirement gradually decreases above age 65 to age 70 at which time the requirement for retirement benefits is 10 years of service. (§ 75025.)

In 1959 the Judges' Retirement Law was amended by adding article 3.6, which provides increased benefits for judges who retire at or before age 70 and an allowance was provided for such a judge's surviving spouse. Pursuant to article 3.6 a judge with 20 or more years of service who retires at or before the designated age may elect to receive a retirement benefit of 75 percent of the current salary of an active judge holding the judicial office last held by the retiring judge.[5] A judge with more than 10 but fewer than 20 years service receives a benefit of 65 percent of such current salary. (§§ 75075, 75076, 75079.)

Because a judge must serve a minimum of 10 years in office to receive any retirement allowance, judges who assume office after the age of 60 must remain in office after age 70 to receive a minimum 50 percent allowance and can never qualify for the higher benefits.

The retirement allowance is payable for the balance of the judge's life, with an allowance thereafter to the judge's surviving spouse equal to one-half of the judge's retirement allowance until the death or remarriage of the surviving spouse. (§ 75077.) If a judge elects not to retire at age 70 and subsequently dies after having later retired, the surviving spouse is not entitled to such benefit.

---

[4] Appellants do not challenge the disability retirement provisions of the Judges' Retirement Law, only the age and service related provisions. (See *McCourtney* v. *Cory, supra,* at pp. 435-436, for a concise history of the development of the Judges' Retirement Law.)

[5] Because judicial retirement benefits are calculated as a percentage of the salary payable to active judges (§ 75076), and because the salaries of active judges may periodically increase pursuant to the formula set forth in section 68203, judicial retirement benefits increase at the same rate as the salaries of active judges.

At trial the parties stipulated as follows concerning the impact of advancing age upon judges: "Physical ability generally declines with age. Mental ability may or may not decline correspondingly. There is no evidence that age 70 is the specific chronological age at which physical or mental decline may commence or occur or at which failure or inability to perform duties may commence or occur or at which persons will suffer disabilities that interfere with the performance of their duties. In fact, it may not be the specific chronological age when such impairment, decline, failure to perform duties or suffering of disabilities that interfere with the performance of duties commences or occurs. Further, there is no evidence to indicate that individual judges or judges as a group suffer at or around the age of 70 a physical or mental decline, a failure or inability to perform duties or disabilities that interfere with the performance of their duties."

In addition, the trial court found that the position of judge is an extremely demanding one, both mentally and physically, that both trial and appellate judges carry very heavy workloads, and that many courts in this state have significant backlogs of work. The court also found that "[m]ost judges who retire at or before age 70 are persuaded to do so because of the economic impact of Article 3.6 . . . ."

## I.

The first step in our analysis is to establish the standard of review to which the protested classification must be subjected. "In considering laws challenged under the equal protection clause, the United States Supreme Court has applied either the 'rational basis' test or the 'strict scrutiny' (also referred to as the 'compelling state interest') test, depending upon the interest affected or the classification involved. (*Dunn* v. *Blumstein* (1972) 405 U.S. 330, 335 . . . .) The latter test will be employed in cases involving 'suspect classifications' or where the challenged legislation adversely affects 'fundamental interests'; otherwise the former test will prevail. (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 . . . .)" (*Bay Area Women's Coalition* v. *City and County of San Francisco* (1978) 78 Cal.App.3d 961, 965-966 [144 Cal.Rptr. 591].) As described by the California Supreme Court in *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], the rational basis test has been applied by the United States Supreme Court in the area of economic regulation where "the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.] [¶] On the other hand, in cases involving 'suspect classifications' or touching on 'fundamental interests,' the court has adopted an attitude of active and critical analysis, subjecting the classification to

strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (Fns. omitted.) (See *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 16-17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17 [112 Cal.Rptr. 786, 520 P.2d 10].)

Plaintiffs acknowledge that California has followed the two-tier approach employed by the United States Supreme Court in reviewing legislative classifications under the equal protection clause.[6] (See *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d at p. 16; *Reece* v. *Alcoholic Bev. etc. Appeals Bd.* (1976) 64 Cal.App.3d 675, 679 [134 Cal.Rptr. 698]; *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at pp. 16-17; *Hull* v. *Cason* (1981) 114 Cal.App.3d 344, 375 [171 Cal.Rptr. 14].)

We note, preliminarily, that age is not recognized under either the California or the federal Constitution as a "suspect" classification, and plaintiffs do not otherwise contend. (See, e.g. *Massachusetts Bd. of Retirement* v. *Murgia* (1976) 427 U.S. 307, 313 [49 L.Ed.2d 520, 524, 69 S.Ct. 2562]; *Vance* v. *Bradley* (1979) 440 U.S. 93, 96-97 [59 L.Ed.2d 171, 175-176, 99 S.Ct. 939]; *Lamb* v. *Scripps College* (9th Cir. 1980) 627 F.2d 1015, 1018-1019; *Kubik* v. *Scripps College* (1981) 118 Cal.App.3d 544, 551-552 [173 Cal.Rptr. 539]; *American Federation of Teachers College Guild* v. *Board of Trustees* (1976) 63 Cal.App.3d 800 [134 Cal.Rptr. 111]; *Townsend* v. *County of Los Angeles* (1975) 49 Cal.App.3d 263, 267-270 [122 Cal.Rptr. 500].) Plaintiffs maintain instead that the statute must be strictly scrutinized because the disparate treatment of judges who are 70 years of age or more impinges on assertedly "fundamental rights" to pursue an occupation, to seek and hold elective office, and to vote.

A. *Occupation.* There is simply no merit to plaintiffs' assertion that the right to employment as a judge is fundamental. "Notwithstanding the principle enunciated in *Truax* v. *Raich* (1915) 239 U.S. 33, 41 . . . that the right to work at a lawful occupation is an essential component of liberty, the United States Supreme Court consistently has refused to recognize a fundamental right to particular employment. (*Vance* v. *Bradley* (1979) 440 U.S. 93, 96-97 . . .; *Massachusetts Bd. of Retirement* v. *Murgia* (1976) 427 U.S. 307, 313 . . . .) California courts have followed substantially the same reasoning, holding in *Townsend* v. *County of Los Angeles* (1975) 49 Cal.App.3d 263, 267 . . . that there is no fundamental right to work for a

---

[6]Plaintiffs' alternatively advanced assertion that an "intermediate" level of scrutiny should nonetheless be adopted is addressed in footnote 11, *post.*

particular employer, public or private. (Accord, *Schmier* v. *Board of Trustees* (1977) 74 Cal.App.3d 314, 318-319 . . ., app. dism. 440 U.S. 941 . . .; *American Federation of Teachers College Guild* v. *Board of Trustees* (1976) 63 Cal.App.3d 800 . . . .)" (*Kubik* v. *Scripps College, supra,* 118 Cal.App.3d 544, 549.) In *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1, the California Supreme Court acknowledged that the rational basis standard of review is traditionally applied to occupational regulation. (*Id.,* at p. 17.) As has been pointed out, "[t]he few exceptions invariably have involved a classification which is 'suspect' in constitutional terms. (See, e.g., *In re Griffiths* (1973) 413 U.S. 717 . . ., *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288 . . ., *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 . . . [national origin or alienage]; *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 . . . [sexual preference; touches upon fundamental privacy interest]; *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1 [gender].) Moreover, the California exceptions noted all have involved the creation of a general barrier to the pursuit of an occupation by a particular group. Hence there is no apparent conflict between *Townsend* v. *County of Los Angeles, supra,* 49 Cal.App.3d 263 and *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1." (Fn. omitted.) (*Kubik* v. *Scripps College, supra,* 118 Cal.App.3d at pp. 549-550.) As recognized in *Kubik, supra,* the California Supreme Court in *D'Amico* "drew a clear distinction between 'common occupations' and 'professions whose technical complexity and intimate relationship to the public interest and welfare counsel greater deference to the legislative judgment.' (*Id.,* at p. 18.)" (*Kubik* v. *Scripps College, supra,* 118 Cal.App.3d at p. 550.)

It is obvious to us that the profession of judge cannot fairly be viewed as one of the "common occupations" of the community. Thus, there is no fundamental right to continue in a judicial occupation.

B. *Elective office—right to vote.* Plaintiffs most heavily rely upon the proposition that the right to seek and hold elective office and the right to vote for candidates of one's choice are fundamental. Plaintiffs contend that the reduction in benefits for judges who have reached the age of 70 adversely influences the decision of such judges to seek additional terms of office as well as to remain in office, and that by inhibiting such judges from seeking reelection and from holding office after the age of 70 the statute also interferes with the right of the electorate to vote for the candidate of its choice.

For purposes of this analysis, state judges are indubitably considered elected officials. (See Cal. Const., art. VI, § 16; 60 Ops.Cal.Atty.Gen. 153, 155-157 (1977).)

In *Bullock* v. *Carter* (1972) 405 U.S. 134 [31 L.Ed.2d 92, 92 S.Ct. 849], the United States Supreme Court declined to hold that the right to seek and hold public office, standing alone, is a fundamental right protected by the Fourteenth Amendment. (Accord *Bill* v. *Williams* (1977) 70 Cal.App.3d 531, 535 [139 Cal.Rptr. 19].) Federal courts examining the constitutional validity of mandatory retirement of judges for age have relied on *Bullock* in reaching the conclusion that the right to run for elective office is not fundamental and that vigorous scrutiny is therefore not required. (*Trafelet* v. *Thompson, supra,* 594 F.2d 623, 631-632; see also *Rubino* v. *Ghezzi, supra,* 512 F.2d 431 [holding that the issue did not present a substantial federal question].) Though they have not always specifically addressed the related right of candidacy, state courts that have examined the constitutionality of compulsory retirement of judges for age have also refused to apply strict scrutiny. (*O'Neil* v. *Baine, supra,* 568 S.W.2d 761; *Aronstam* v. *Cashman, supra,* 325 A.2d 361; *Nelson* v. *Miller, supra,* 25 Utah 2d 277 [480 P.2d 467]; *Boughton* v. *Price, supra,* 70 Idaho 243 [215 P.2d 286].)[7]

In the past the California Supreme Court has termed the right to hold public office "fundamental." (*Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 720 [94 Cal.Rptr. 602, 484 P.2d 578]; *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 335 [38 Cal.Rptr. 625, 392 P.2d 385]. See also *Carter* v. *Com. on Qualifications, etc.* (1939) 14 Cal.2d 179, 182 [93 P.2d 140], describing the right to hold public office as "one of the valuable rights of citizenship.") More recently, however, that court has acknowledged United States Supreme Court authority on this issue that calls into question the fundamental nature of the right (*Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 466 [125 Cal.Rptr. 129, 541 P.2d 881]) and has "adopted the posture of the federal courts in determining whether the classification should be closely scrutinized by studying the impact on other related rights. (*Knoll* v. *Davidson* [1974] 12 Cal.3d 335 [116 Cal.Rptr. 97, 525 P.2d 1273]; *Thompson* v. *Mellon* [1973] 9 Cal.3d 96 . . . .)" (*De Bottari* v. *Melendez* (1975) 44 Cal.App.3d 910, 915-916 [119 Cal.Rptr. 256], fn. omitted; see also *Bay Area Women's Coalition* v. *City and County of San Francisco, supra,* 78 Cal.App.3d 961, 966-968.)

---

[7]We recognize that our State Supreme Court has exercised independence in its application of the state equal protection clause (Cal. Const., art. I, § 7), utilizing strict scrutiny where the United States Supreme Court has declined to do so. (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764-767 [135 Cal.Rptr. 345, 557 P.2d 929]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; see *Lucchesi* v. *City of San Jose* (1980) 104 Cal.App.3d 323, 332, fn. 8 [163 Cal.Rptr. 700].) However, it has also been stated that "[t]he equal protection standards of the Fourteenth Amendment, and of the state's Constitution, are substantially the same. [Citations.]" (*Hull* v. *Cason, supra,* 114 Cal.App.3d 344, 375.) Moreover, as we explain, in this area the California Supreme Court appears to have adopted the approach taken by the United States Supreme Court in analyzing purported restrictions on rights to elective office which may also impinge upon voters' rights.

■ Both the United States and California Supreme Courts have utilized strict scrutiny only where barriers to candidacy have a real and appreciable impact upon other fundamental rights, such as the right to vote. (E.g., *Bullock* v. *Carter, supra,* 405 U.S. 134; *Lubin* v. *Panish* (1974) 415 U.S. 709 [39 L.Ed.2d 702, 94 S.Ct. 1315]; *Williams* v. *Rhodes* (1968) 393 U.S. 23 [21 L.Ed.2d 24, 89 S.Ct. 5]; *Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33 [157 Cal.Rptr. 855, 599 P.2d 46]; *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461 [125 Cal.Rptr. 129, 541 P.2d 881]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661 [122 Cal.Rptr. 377, 536 P.2d 1337]; *Knoll* v. *Davidson* (1974) 12 Cal.3d 335 [116 Cal.Rptr. 97, 525 P.2d 1273]; *Thompson* v. *Mellon* (1973) 9 Cal.3d 96 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029]; *Bay Area Women's Coalition* v. *City and County of San Francisco, supra,* 78 Cal.App.3d 961, 966-968; *Bill* v. *Williams, supra,* 70 Cal.App.3d 531; *De Bottari* v. *Melendez, supra,* 44 Cal.App.3d 910.)

In this connection, it was recognized in *Bullock* that "laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. [Citation.]" (405 U.S. 134, 143 [31 L.Ed.2d 92, 99].)[8] The California Supreme Court has similarly observed that, "Although a fundamental interest may be involved . . . not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny standard. When the regulation merely has an incidental effect on exercise of protected rights, strict scrutiny is not applied. (E.g. *Zablocki* v. *Redhail* (1978) 434 U.S. 374 . . . [regulations affecting the right to marry]; *Califano* v. *Jobst* (1977) 434 U.S. 47 . . . [same]; *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 303-305 . . . [reasonable limitations on placement of newspaper racks]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 670 . . . [rational basis standard applicable to numerous statutes detailing the mechanisms of the right to vote].) It is only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right that the strict scrutiny doctrine will be applied. [Citations.]" (*Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, 47; see *Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438].)

---

[8]The *Bullock* court reasoned that the Texas filing fee system requiring in some cases substantial fees to run for office, had a "patently exclusionary character." (405 U.S. at p. 143.) The court concluded that strict scrutiny was required as the system ". . . falls with unequal weight on voters, as well as candidates, according to their economic status" (*id.,* at p. 144 [31 L.Ed.2d at p. 100]), thus resulting in a "real and appreciable impact on the exercise of the franchise . . . related to the resources of the voters supporting a particular candidate . . . ." (*Ibid.*)

The courts have traditionally found the right to vote impermissibly burdened in the three principal contexts described in *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, 779-781. The first is that in which a state law excludes various groups from voting in all or certain types of elections. Such cases typically involve residency requirements (also burdening the right to travel) (e.g. *Thompson* v. *Mellon, supra,* 9 Cal.3d 96; *Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716; *Bay Area Women's Coalition* v. *City and County of San Francisco, supra,* 78 Cal.App.3d 961;), voter qualification and land ownership requirements (*Choudhry* v. *Free, supra,* 17 Cal.3d 660), poll taxes and the like.

The second major area in which, applying strict scrutiny, the courts have intervened on equal protection grounds is where state geographical districting systems dilute the effectiveness of the franchise either directly or through the allocation of legislative representation. (E.g. *Reynolds* v. *Sims, supra,* 377 U.S. 533 [involving malapportionment of state legislatures and applying the "one man one vote" rule to legislative apportionment].)

The third category in a general way "deals with the extent to which a state, through the political process, may impose on the interests of one group burdens which are significantly more onerous than it imposes on similar interests of other groups." (*Westbrook* v. *Mihaly, supra,* 2 Cal.3d at p. 780.) (E.g. *Williams* v. *Rhodes, supra,* 393 U.S. 23 [holding unconstitutional Ohio election laws imposing requirements to qualify for positions on ballots giving a decided advantage to established political parties].)

California cases relied upon by plaintiffs in support of their claim that the right to seek and retain elective office is inherently intertwined with the right to vote and that the Judges' Retirement Law burdens both, generally fall into one of the above three areas[9]; that is, the cases relied upon all involved the imposition of direct burdens upon a fundamental right, either the right to vote or the important right to travel.

---

[9]*Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, held unconstitutional former California Constitutional provisions requiring a two-thirds majority for approval of local bond issues, diluting voter strength of supporters of those bonds. *Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716, held unconstitutional a county charter provision imposing a five-year residency requirement on all candidates for the board of supervisors. *Johnson* v. *Hamilton, supra,* 15 Cal.3d 461, held unconstitutional charter provisions imposing residence requirements for candidates for city office. *De Bottari* v. *Melendez, supra,* 44 Cal.App.3d 910, invalidated an election code provision disqualifying a recalled city officer from candidacy for one year following recall. *Fort* v. *Civil Service Commission, supra,* 61 Cal.2d 331, held unconstitutional as a violation of equal protection a county charter provision prohibiting any person holding a classified civil service position from taking any part in "political management or affairs in any political campaign or election, or in any campaign to adopt or reject any initiative or

■ The age-based benefit reduction provisions of the Judges' Retirement Law, on the other hand, have an unintended, indirect and, in any case, attenuated effect on the right to vote. As stated in *Trafelet v. Thompson, supra,* 594 F.2d 623: "Any limitation on voting rights [as a result of *mandatory* judicial retirement] is incidental to a classification not aimed at voters or elections." (*Id.*, at p. 632; see also *Rubino v. Ghezzi, supra,* 512 F.2d 431, rejecting the contention under consideration upon holding that no substantial federal question was presented; accord *Manson v. Edwards* (6th Cir. 1973) 482 F.2d 1076, 1077-1078.) "[M]andatory judicial retirement disenfranchises no voter. It imposes no bar to a political group seeking to field a candidate of a certain political persuasion." (*Aronstam v. Cashman, supra,* 325 A.2d 361, 365.) If mandatory judicial retirement has been held to disenfranchise no voter, it is impossible to reach a different conclusion with respect to a system, such as that before us, which simply encourages retirement rather than compels it.

For the foregoing reasons, we hold that article 3.6 of the Judges' Retirement Law does not impermissibly infringe any fundamental right here asserted.[10] ■ ■ ■ ■ Accordingly, we evaluate the merits of the classification here at issue by the rational basis test—i.e., does the legislation meet the test of reasonableness? (See *McCourtney v. Cory, supra,* 123 Cal.App.3d 431, 439.)[11]

## II.

referendum measure other than to cast his vote or to privately express his opinion . . . ." (*Id.*, at p. 333.) *Knoll v. Davidson* (1974) 12 Cal.3d 335 [116 Cal.Rptr. 97, 525 P.2d 1273], held that in the absence of reasonable alternative means of ballot access, the state could not require an indigent candidate to pay the filing fee which he was not able to pay. *Bay Area Women's Coalition v. City and County of San Francisco, supra,* 78 Cal.App.3d 961, struck down a durational residence requirement for eligibility for appointive office on the grounds that it penalized the right to travel. *Gould v. Grubb, supra,* 14 Cal.3d 661, struck down the incumbent first ballot as diluting the vote of those supporting nonincumbents for office.

[10]This holding renders it unnecessary to address plaintiffs' contention that the Judges' Retirement Law unconstitutionally conditions the receipt of pension benefits upon the relinquishment of fundamental rights.

[11]Plaintiffs urge this court, in the alternative, to utilize a more intensive "intermediate" scrutiny to inquire whether the classification significantly fosters an important state interest. (See *Hawkins v. Superior Court* (1978) 22 Cal.3d 584, 596, 601 [150 Cal.Rptr. 435, 586 P.2d 916] (conc. opn. of Mosk, J.); *Hays v. Wood* (1979) 25 Cal.3d 772, 796 [160 Cal.Rptr. 102, 603 P.2d 19] (conc. opn. of Mosk, J.).) This intermediate level scrutiny (sometimes termed "sliding scale scrutiny") has been utilized by the Supreme Court in analyzing gender-based classifications. (See, e.g., *Craig v. Boren* (1976) 429 U.S. 190, 197 [50 L.Ed.2d 397, 406, 97 S.Ct. 451]; *Reed v. Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251].) Such third-tier review or a variant thereof has been earnestly advocated by Justice Marshall, who has characterized the two-tier model of analysis as "outdated and intellectually disingenuous" *Beal v. Doe* (1977) 432 U.S. 438, 457 [53 L.Ed.2d 464, 479, 97 S.Ct. 2366] (dis. opn.); *San Antonio School District v. Rodriguez* (1973) 411 U.S. 1,

■ The California Supreme Court has expressed the rational basis test in various ways. "Some decisions require that the classification '"bear some rational relationship to a conceivable legitimate state purpose"' (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16 . . .); others, that the classification must rest upon 'some ground of difference having a fair and substantial relation to the object of the legislation' (*Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 . . .; *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 . . .)." (*Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].)[12] In *Newland* v. *Board of Governors, supra,* the court recognized the differences in terminology without choosing be-

98-99 [36 L.Ed.2d 16, 80-81, 93 S.Ct. 1278] (dis. opn.); *Dandridge* v. *Williams* (1970) 397 U.S. 471, 519-521 [25 L.Ed.2d 491, 521-522, 90 S.Ct. 1153] (dis. opn.); *Richardson* v. *Belcher* (1971) 404 U.S. 78, 90 [30 L.Ed.2d 231, 240, 92 S.Ct. 254] (dis. opn.); *Massachusetts Bd. of Retirement* v. *Murgia, supra,* 427 U.S. 307, 318-321 [49 L.Ed.2d 520, 527-529] (dis. opn.), and by California Supreme Court Justice Mosk (*Hawkins* v. *Superior Court, supra,* 22 Cal.3d 584, 595 (conc. opn.); *Hays* v. *Wood, supra,* 25 Cal.3d 772, 795 (conc. opn.)) as well as by respected constitutional scholars (Gunther, *The Supreme Court 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* (1972) 86 Harv.L.Rev. 1, 8, Tribe, American Constitutional Law (1978) at p. 1089.)

Nevertheless, the United States Supreme Court appears to have remained committed to the two-tier model except in very limited areas such as those involving gender-based discrimination and disadvantageous treatment on the basis of alienage and illegitimacy. (See Nowak, et al., Constitutional Law (2d ed. 1983) ch. 16, §§ IV, V, pp. 701-730.)

The United States Supreme Court has not applied a mid-level scrutiny to classifications based upon age and it has adhered to the two-tier scrutiny model in reviewing equal protection challenges to alleged burdens upon the rights of voters, and the asserted rights to pursue an occupation or to seek elective office. (Cf. *Anderson* v. *Celebrezze* (1983) 460 U.S. 780, 786-787, fn. 7, 75 L.Ed.2d 547, 556, 103 S.Ct. 1564, 1569].) "The equal protection standards under the Fourteenth Amendment to the United States Constitution and article I, section 7, of the California Constitution are substantially the same. (*Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d at p. 15, fn. 13.) California follows the two-level test employed by the United States Supreme Court in reviewing legislative classifications under the equal protection clause." (*Reece* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 64 Cal.App.3d 675, 679.) If anything, the California Supreme Court appears even more committed than the federal court to the two-tier model of scrutiny. For instance, in cases of gender based discrimination strict scrutiny is utilized under the California Constitution on the grounds that sex is a suspect classification. (*Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1; see *Hawkins* v. *Superior Court, supra,* 22 Cal.3d 584, 607 (conc. opn. of Bird, C. J.)

As an intermediate appellate court we are constrained to adhere to the two-tier equal protection analysis embraced by both the United States Supreme Court and our own Supreme Court despite our recognition of the case that has been made for enhanced scrutiny of age-based classifications (see, e.g., Eglit, *Of Age and the Constitution* (1981) 57 Chi.-Kent L.Rev. 859) and of the ferment in this area of the law. (See, e.g., Levine, *Comments on the Constitutional Law of Age Discrimination* (1981) 57 Chi.-Kent L.Rev. 1081.) We are cognizant, in this regard, that federal intermediate appellate courts have also declined requests to apply a mid-level standard of review to age-based classifications. (See, e.g., *Gault* v. *Garrison* (7th Cir. 1977) 569 F.2d 993, 995, fn. 4.)

[12]*Reed* v. *Reed, supra,* of course, is frequently cited as the beginning of use of intermediate level scrutiny in cases involving gender based classifications. (See Nowark et al., Constitutional Law, supra, ch. 16, § V, p. 714; Tribe, *supra,* § 16-25, p. 1063.)

tween them, holding that whichever "linguistic formulation" is employed, the court must conduct " 'a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals' [citation] . . . ." (*Newland* v. *Board of Governors, supra,* 19 Cal.3d 705, 711; see *Cooper* v. *Bray* (1978) 21 Cal.3d 841, 848 [148 Cal.Rptr. 148, 582 P.2d 604].) We proceed to do so.

As earlier noted, the trial court found and the legislative history clearly indicates that the primary purpose of article 3.6 is to prevent a superannuated judiciary by providing an incentive to retire at or before the age of 70.[13]

Plaintiffs do not, of course, dispute the legitimacy of the state's interest in assuring the most qualified judiciary possible. (See *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474 [159 Cal.Rptr. 494, 601 P.2d 1030]; *McComb* v. *Commission on Judicial Performance* (1977) 19 Cal.3d Spec. Trib. Supp. 1 [138 Cal.Rptr. 459, 564 P.2d 1].) Putting aside for the moment their subsidiary contentions, plaintiffs' central remaining claim is that the challenged provisions of the Judges' Retirement Law are not rationally related to this interest because there is no correlation between age and competency. As stated in their brief, plaintiffs insist that article 3.6 "serves no legitimate state purpose but only promulgates the invidious stereotype of older Americans being useless in today's society . . . ."[14]

Although the United States Supreme Court appears to have repudiated the existence of such a stereotype (see *Massachusetts Bd. of Retirement* v. *Mur-*

---

[13]In a letter by Fred B. Wood, then chairman of the Legislative Committee of the Conference of California Judges, to then Governor Edmund G. Brown, Sr., dated June 1, 1959, which is part of the legislative history of Government Code section 75075 (of which we take judicial notice), the purpose of article 3.6 is stated as follows: "The main feature of this bill furnishes an incentive to a judge to retire before he becomes superannuated. It does this by granting him a more adequate retirement allowance than if he were to remain on the job after reaching 70 years of age. (It is a practical substitute for compulsory retirement at 70, which would require a constitutional amendment. It avoids the delay which the constitutional amendment process would involve.)" In a letter by Senator George Miller, Jr. to Governor Brown dated June 25, 1959, Senator Miller describes the primary purpose of the bill as follows: "Many of the judges have been forced to continue on the bench, even though they and the courts would be better off if they retired, because to retire would shut their spouses off from any benefits in the event of their death. Under the present law the widow's benefits were provided for only in the event that the death occurred while the judge was still on the bench. [¶] This bill will result in many of the older judges retiring (I hope it will catch the irascible, senile characters with it), who otherwise could not retire without leaving their widows in jeopardy."

[14]Plaintiffs are alleging, in other words, that the Judges' Retirement Law exemplifies "ageism," which is defined by Dr. Robert Butler, former director of the National Institute of Aging, who coined the term, as the "process of systematic stereotyping of and discrimination against people because they are old . . . ." (Butler, Why Survive? Being Old in America (1975) p. 12.)

*gia, supra,* 427 U.S. 307, 313 [49 L.Ed.2d 520, 524], where it is stated that the aged have not "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities") there is nonetheless a considerable body of informed opinion that this stereotype[15] does exist[16] and that it exerts a powerful influence in the formulation of employment policy in our society.[17] Despite the ancient view that old age is a positive virtue in judges,[18] the instant case and others like it demonstrate that judges are not immune from this stereotype;[19] and neither, apparently, are many lawyers. (See Note, *The Age Discrimination in Employment Act*

[15]By "stereotype" we mean a negative and inaccurate generalization. For the relationship between stereotypes and prejudice as it applies to equal protection analysis of age discrimination see, Levine, *Comments on the Constitutional Law of Age Discrimination, supra,* 57 Chi.-Kent L.Rev. 1081, 1107-1110.

[16]See, e.g., Birren & Loucks, *Age Related Change and the Individual* (1981) 57 Chi.-Kent L.Rev. 833; McDougal et al., *The Human Rights of the Aged: An Application of the General Norm of Nondiscrimination* (1976) 28 U.Fla.L.Rev. 639; Baltes & Schaie, *Aging and I.Q.: The Myth of the Twilight Years* (March 1974) Psychology Today, at p. 35; Guildrium, The Myth of the Golden Years (1973); Butler, *Ageism: Another Form of Bigotry* (1969) 9 Gerontologist 243.

[17]See, e.g., Pepper, *Age Discrimination in Employment: A Growing Problem in America* (1982) in Inside Views of Corporate Age Discrimination, Hearing Before the House Select Com. on Aging, 97th Cong., 2d Sess.; Drucker & Moore, *Mandatory Retirement: Past, Present and Future of an Anachronism* (1977) 5 Western St.U. L.Rev. 1; Rosen & Jerdee, *The Nature of Job-Related Age Stereotypes* (1976) 61 J. Applied Psychology 180; Note, *Age Discrimination in Employment* (1975) 50 N.Y.U. L.Rev. 924; Note, *Mandatory Retirement—A Vehicle for Age Discrimination* (1974) 51 Chi.-Kent L.Rev. 116; Withers, *Some Irrational Beliefs About Retirement in the United States,* (Winter 1974) Indus. Gerontology 23; and Note, *Age Discrimination in Employment: The Problem of the Older Worker,* (1966) 41 N.Y.U. L.Rev. 383.

[18]Thus, for example, Plato declared that "The judge should not be young; he should have learned to know evil, not from his own soul, but from late and long observation of the nature of evil in others: knowledge should be his guide, not personal experience." (Plato, The Republic, Book III.) (But see Tacitus, Annals, XV, c. 110 ["Judges are best in the beginning; they deteriorate as time passes."].)

[19]Indeed, the stereotype has enjoyed support at the highest levels of the bench and bar in this nation. For example, at a 1958 conference on court congestion, Chief Justice Warren Burger, then a member of the United States Court of Appeals for the District of Columbia, declared that ". . . there are in the Federal system over the country all too many Federal judges who have long since passed the peak of their powers, and who could, but do not, retire at full pay for life. Their insistence in holding the powers of office after they have passed the full capacity to perform all the duties of office is unfair to litigants, unfair to the judicial system and a disservice to the administration of justice." (quoted in Schmidhauser, *Age and Judicial Behavior: American Higher Appellate Judges,* in Politics of Age (Proceedings of U. of Mich. 14th Annual Conf. on Aging (Donahue & Tibbitts, edits.) (Univ. of Michigan 1962) at p. 104.) (At the present time, ironically, Chief Justice Burger is 76 years of age, and four of his colleagues—Justices Brennan, Marshall, Powell and Blackmun—are, respectively, 78, 76, 76 and 75 years of age. The average age of the *entire* Supreme Court is 70 and the median age is 75.) For the view of a prominent member of the California bar similar to that of Chief Justice Burger, see Sheppard, *Judicial Retirement: The Age of Judges and the Judge of Ages* (1958) 44 A.B.A. J. 145; for the contrary view of a state judge see Anderson, *Age Discrimination: Mandatory Retirement From the Bench* (1974) 20 Loyola L.Rev. 153.

*and Mandatory Retirement of Law Firm Partners* (1980) 53 So.Cal.L.Rev. 1679.)

In any event, the stereotype reflected in the Judges' Retirement Law has been challenged by those who are best informed on the mental and physical effects of age. As recently noted, "[a] longstanding consensus in the medical community holds that age, even old age, is not to be trusted as a definitive statement of job ability. In 1974 an AMA committee announced: 'Chronological age has been observed to have no magic in terms of judgment, ability, and physical dexterity. Individuals may lose these qualities at age forty or retain them past eighty and [therefore retirement] should be based on the individual's competence and ability, not age.'" (Note, *Age Discrimination in Retirement: In Search of an Alternative* (1982) 8 Am.J. L. & Med. 433, 447, quoting 230 J. A.M.A. 1312 (1974) (A.M.A., Committee on Aging).)[20]

However, the evidence that a statute that compels or otherwise induces retirement at a presumptive age is both over-inclusive and under-inclusive (because incompetent persons below that age escape involuntary retirement)[21] warrants only the conclusion that such a statute will sometimes work unfairly and is, perhaps, unwise. Such a statute may not be set aside on constitutional grounds, however, if any basis reasonably may be conceived to justify it. (*Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 530 [3 L.Ed.2d 480, 486, 79 S.Ct. 437]; *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1, 16; *Kubik* v. *Scripps College, supra,* 118 Cal.App.3d 544, 552.)

---

[20]The AMA Committee on Aging earlier reported in 1969 that: "[U]seful working life (and not merely life) is being prolonged. If capable, workers should be allowed to work if they so desire, even beyond the usual retirement age . . . workers between 60 and 75 years of age are not only proving to be capable of working in many occupations; they actually excel younger persons because of their superior judgment, experience, and safety of performance. Advances in technology that have taken away much of the physical stress of work tend in many instance [*sic*] to place a premium on the abilities that many older workers possess." American Medical Ass'n Employment of Older People 10 (n.d.) (pamphlet published by AMA Committee on Aging) (quoting from Special Committee of the Gerontological Society, *Report,* 9 Gerontologist 23 (pt. II, Winter 1969)).

[21]The Judges' Retirement Law is also underinclusive, as plaintiffs point out, because it effectively encourages only "nonaffluent" judges to retire, not those who are independently wealthy. Such disparate treatment on the basis of income level is of no constitutional significance, first of all, because no fundamental right is here involved. Moreover, even if a fundamental right were at stake in this case, "nonaffluence," however reasonably defined with respect to judges, hardly rises to the level of "indigence" or "poverty," which, when it does result in the effective deprivation of certain highly protected rights, has been utilized to justify judicial intervention on equal protection grounds. (See, e.g., *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; but see *Harris* v. *McRae* (1980) 448 U.S. 297 [65 L.Ed.2d 784, 100 S.Ct. 2671].)

We are constrained to note that, despite their limitations and the extent to which they facilitate stereotyping, age distinctions are a deeply ingrained mechanism of social control in our society, as in all others. "Decisions regarding the allocation of public resources, the extension and denial of public benefits, the imposition of legal disadvantages and the relaxation of legal responsibilities are commonly based on the age of the individual who is at the target end of these determinations." (Eglit, *Of Age and the Constitution* (1981) 57 Chi.-Kent L.Rev. 859, citing Cain, *The Growing Importance of Legal Age in Determining the Status of the Elderly* (1974) 14 Gerontologist 167.) Moreover, such age distinctions, which are embedded in our Constitution[22] as well as throughout our laws and regulations, do serve several useful purposes. "For one, reliance upon age categorizations facilitates decisionmaking. Rather than a program administrator having to engage in the time-consuming and costly exercise of determining whether a given individual does or does not fit into a programmatic charter, he can rely upon a clear, indisputable fact—the age of the person involved. In a society such as ours, heavily larded with bureaucratically administered programs extending benefits and entitlements, the accompanying dollar and time savings can be enormous.

"Not only do the bureaucrats gain; there are advantages for the individual as well. Certainly, use of age distinctions enables speedier decisions than would individualized treatment. There are even some gains in fairness which likely accrue from employing age criteria, for use of the unarguable factor of age mitigates the potential for discretionary injustice which is inherent when a bureaucratic system is called upon to render judgments in a context which leaves room for subjective evaluation. Added to these advantages for the individual are the likely benefits which follow for society as a whole from an age-reliant system: so long as a system works the same for all people by unswervingly using the objective factor of age as the basis for decisionmaking, the appearance of justice is generated and maintained—a not inconsiderable plus in a society increasingly suspicious of government.

"Age lines adopted in statutes and regulations also serve to translate social attitudes into legal norms, thereby presumably satisfying more intan-

---

[22]The United States Constitution requires that the President and Vice President must be at least 35 (U.S. Const., art. II, § 1, and 12th Amend.), that senators must be at least 30 (*id.*, art. I, § 3) that representatives must be at least 25 (*id.*, art. I, § 2) and prohibits denial or abridgment of the right to vote only for those over 18 (*id.*, 26th Amend.). It should also be noted, however, that article III of the Constitution prohibits age distinctions with respect to the federal judiciary through the absence of a minimum age requirement and the guarantee of life tenure. On the other hand, Congress has provided that chief judges of federal district courts and courts of appeal may not continue to serve in that position past the age of 70. (28 U.S.C. § 45 (a).) Arguments for amending the Constitution by adopting a compulsory retirement age for federal judges are set forth in Hearing before a Subcommittee of the Committee on the Judiciary, United States Senate, 83d Congress, 2d Session, on Senate Joint Resolution No. 44 (Jan. 29, 1954).

gible, but nonetheless real, societal needs. Delineation of groups by their ages serves to facilitate the expression of certain felt perceptions about those groups: the notion that children may, and should, properly be subjected to both social protections and controls because they are physically, emotionally and intellectually immature; the perception on the one hand that older people have had their day in the sun and thus may properly be moved out of the way, and on the other hand that the aged are deserving of society's helping hand; the belief that adults in the youthful and middle-aged ranges should not be dependent, but rather should shoulder their responsibilities without special government aid." (Eglit, *Of Age and the Constitution, supra,* at pp. 860-861; see also Neugarten, *Age Distinctions and Their Social Functions* (1981) 57 Chi.-Kent L.Rev. 809, 813-820.)

For the foregoing reasons, and as well because the United States Supreme Court has effectively declared that the correlation between increasing age and decreasing ability to competently perform work is a "logical assumption" that need not be verified by current empirical proof (*Vance* v. *Bradley, supra,* 440 U.S. 93, 110 and fn. 28 [59 L.Ed.2d 171, 184]),[23] we are obliged to conclude that the age distinction embodied in the Judges' Retirement Law rests on a rational basis. We are mindful, in this regard, that, while their decisions are not binding upon us, numerous other courts that have reviewed state laws that *mandate* judicial retirement at age 70, and therefore go further than the one we review here, have uniformly held that such laws are not irrational in the constitutional sense. (*Malmed* v. *Thornburgh, supra,* 621 F.2d 565; *Trafelet* v. *Thompson, supra,* 594 F.2d 623; *O'Neil* v. *Baine, supra,* 568 S.W.2d 761; *Rubino* v. *Ghezzi, supra,* 512 F.2d 431; *Aronstam* v. *Cashman, supra,* 325 A.2d 361; *Nelson* v. *Miller, supra,* 25 Utah 2d 277 [480 P.2d 467]; and *Boughton* v. *Price, supra,* 70 Idaho 243 [215 P.2d 286].) Common to these cases are the assumptions that a state has a legitimate interest in maintaining a "vigorous" or "competent" judiciary; that at some point the debilitation of age diminishes judicial vigor or competence; that the age at which this is most likely to occur cannot be

---

[23]The language in *Vance* referred to essentially repudiates the earlier declaration in *Gault* v. *Garrison, supra,* 569 F.2d 993, 996, that the defense of an age-based retirement rule must include the presentation of evidence indicating a factual relationship between the designated retirement age and the job in question. (See *Trafelet* v. *Thompson, supra,* 594 F.2d at p. 627.) As applied to age classifications such as that here challenged, *Vance* also effectively repudiates the somewhat different view that, in order to put "new life" into judicial enforcement of the equal protection clause, justifying rationales should not be judicially considered unless the government can demonstrate that such purposes were actually contemplated by the legislature. (See Gunther, *The Supreme Court 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, supra,* 86 Harv.L.Rev., at pp. 21, 43-47, and Tribe, American Constitutional Law, supra, § 16-30 at pp. 1082-1088.)

fixed with certainty; and that the presumptive determination of that age, within reasonable limits, is best left to the legislature.[24]

In *Rubino* v. *Ghezzi, supra,* 512 F.2d 431 the United States Court of Appeals for the Second Circuit found that mandatory judicial retirement at age 70 was reasonable on the additional ground that it encouraged "younger attorneys with judicial aspirations."[25] *(Id.,* at p. 433.) ■ This theory that expanding employment opportunities for younger persons is a legitimate governmental purpose and that it is served by mandatory retirement has been adopted by California courts. Thus, for example, in *Townsend* v.

[24]For example, in sustaining a Missouri statute mandating the retirement of judges at age 70, the Supreme Court of that state stated as follows: "Our citizens are entitled to a judicial system of the highest caliber and to judges with the highest possible mental and physical qualifications. Mandatory judicial retirement is an attempt by the General Assembly to insure the fitness of the judiciary as a whole and to insure the continued competency of the system. The General Assembly in adopting the statute dealt in probabilities. That is all humans can do. There are certain ages in life, learned from experience, at which there is a lessening in mental, physical abilities. If mandatory retirement is invalid at age 70, then at what age— 80, 90, or 100? To paraphrase Holmes,—in life, one must make choices. That is what the General Assembly did. The statute draws a line at a certain age which tends to uphold the high competency for judicial posts and which fulfills a societal demand for the highest caliber of judges in the system." *(O'Neil* v. *Baine, supra,* 568 S.W.2d at p. 766.)

Similarly, in *Trafelet* v. *Thompson* the United States Court of Appeals for the Seventh Circuit, in affirming the constitutionality of the Illinois Compulsory Retirement of Judges Act, which was designed to "insure a more vigorous judiciary to which the public is entitled," concluded that there was a rational basis for treating judges differently when they reach age 70. "The legislature could rationally have justified treating judges differently from other officials on the ground that the work of judges makes unique and exacting demands on faculties that age tends to erode. Although defenders of the statute were not required to establish by evidence a rationality that is obvious from the common experience of mankind (see *Vance* v. *Bradley, supra,* [440 U.S. at p. 110, and fn. 28]), they nevertheless did so. The district court found that published scientific data, some predating the enactment of the Act in 1965, show an association between aging, specifically during the sixth and seventh decades of life, and a decline in intellectual function and personality factors. It is irrelevant that evidence was adduced to rebut this data . . . ." *(Trafelet* v. *Thompson, supra,* at p. 627.) The court recognized that "[m]any judges compelled to retire at 70 will still be highly competent. When, however, a statutory requirement of retirement at a given age is tested by the rational relationship standard, the line drawn by the legislature will be accepted where '[t]here is no indication that [the statute] has the effect of excluding from service so few . . . who are in fact unqualified as to render age . . . a criterion wholly unrelated to the objective of the statute.' *(Massachusetts Board of Retirement* v. *Murgia, supra,* 427 U.S. at pp. 315-316 . . . . See also *Vance* v. *Bradley, supra,* [440 U.S. at pp. 110-111], . . . (the classification was not made invalid by 'the fact that individual Foreign Service employees may be able to perform past age 60'); [citations]." *(Trafelet* v. *Thompson, supra,* 594 F.2d at pp. 627-628.) (See also *Rubino* v. *Ghezzi, supra,* 512 F.2d 431; *Malmed* v. *Thornburgh, supra,* 621 F.2d 565.)

[25]Related to this idea is the feeling in some quarters that schemes that compel or encourage the retirement of older judges provide a measure of assurance against stagnation of particular economic, political, social, or philosophical thought on the bench. (See, e.g., Statement of Albert E. Jenner, Jr., representing the American Bar Association, Hearing before a Subcommittee of the Committee on the Judiciary, U.S. Sen., 83d Cong., 2d Sess., on Sen.J. Res. No. 44, (a joint resolution proposing an amendment to the Constitution relating to the composition and jurisdiction of the Supreme Court) p. 21 (Jan. 29, 1954).)

*County of Los Angeles, supra,* 49 Cal.App.3d 263, the court stated: "We find nothing arbitrary, discriminatory or unreasonable in establishing maximum retirement ages. Plaintiff's assertions of arbitrariness assume that the sole issue in determining the validity of mandatory retirement ages is the job effectiveness and protection of current jobholders. Rather, however, mandatory retirement increases the opportunity for all qualified persons to share in public employment and permits governmental units to plan for orderly attrition through lower retirement ages, orderly growth through higher retirement ages." (*Id.,* at p. 268; see also *Tante* v. *Board of Administration* (1979) 93 Cal.App.3d 615 [156 Cal.Rptr. 53]; *Schmier* v. *Board of Trustees* (1977) 74 Cal.App.3d 314 [141 Cal.Rptr. 472]; *American Federation of Teachers College Guild* v. *Board of Trustees, supra,* 63 Cal.App.3d 800.)

■ Plaintiffs alternatively argue that even if, standing alone, it may be reasonable to utilize an economic disincentive to discourage judges from continuing to serve after the age of 70, the challenged provisions of article 3.6 are nonetheless irrational because other provisions of the Judges Retirement Law are at cross purposes with that goal. Plaintiffs point out, for example, that a judge must have served in office ten years before reaching eligibility for a 50 percent pension allowance. Therefore, a judge who assumes office over the age of 60 is required to remain on the bench past age 70 to qualify for any retirement benefit. (§ 75025.) Moreover, plaintiffs argue that section 75104.4 encourages older judges to remain in office by providing an allowance to the surviving spouse of a judge who dies before retirement but after becoming eligible for retirement, if that judge had served for 30 years.

Though plaintiffs are correct that the foregoing provisions are somewhat inconsistent with the challenged provisions of article 3.6, they really do no more than mitigate the harsh consequences that would otherwise result from application of the Judges' Retirement Law to limited groups of older judges. Such legislative concessions are hardly an adequate basis upon which to invalidate the basic concept of the legislative scheme, with which they are not fundamentally in conflict.

Plaintiffs next contend that the presumption of incompetency embodied in article 3.6 is demonstrably irrational in light of article 4 of the Judges' Retirement Law (§ 75080 et seq.), which provides for the assignment of retired judges as pro tem judges and for their appointment as masters or referees. Provisions for such employment of retired judges cannot be rationalized, plaintiffs maintain, unless retired judges are deemed competent to serve in judicial office.

The asserted conflict between articles 3.6 and article 4 again results from a legislative effort to strike a reasonable balance between the perceived need to encourage retirement from full-time active service of judges over the age of 70 and the recognition that the workload of our courts occasionally require the assistance of retired judges, many of whom are over 70. Such a resolution of competing goals is precisely the sort that is best left to the legislative process. The courts may not gainsay the wisdom of such a legislative resolution where, as here, it is rationally based. (See *Lamb* v. *Scripps College, supra,* 627 F.2d 1015, 1023.)

■ We are also unpersuaded by plaintiffs' claim that the Judges' Retirement Law is irrational because it treats judges differently than legislators despite the alleged "comparable demands" of their respective offices. It is enough for us to note that the judicial role is distinct from the legislative and "[t]he equal protection clause does not prohibit the legislature from adopting a more rigorous policy for assuring excellence in the judiciary than for other elective offices." (*Trafelet* v. *Thompson, supra,* 594 F.2d at p. 627; see *Vance* v. *Bradley, supra,* 440 U.S. at p. 102 [59 L.Ed.2d at p. 179].)

■ Plaintiffs' contention that the individualized evaluation of judges by the Commission on Judicial Performance is an available means of better insuring judicial competence similarly would not render the challenged retirement statutes unconstitutional, even if the assertion were correct. (*Trafelet* v. *Thompson, supra,* 594 F.2d at p. 628.) However, the Commission on Judicial Performance is now authorized only to investigate claims of disability or misconduct; it has no authority to recommend removal or retirement of a judge for inefficiency nor to take preventive action against a judge before he or she has demonstrated any disability or acted improperly. (Cal. Const., art. VI, § 18.) Moreover, and in any event, the fact that judicial competence can be determined more precisely through individualized evaluation does not mean that the objective of assuring such competence is not rationally furthered by economic incentives for judges to retire at age 70. (*Massachusetts Bd. of Retirement* v. *Murgia, supra,* 427 U.S. 307, 316 [49 L.Ed.2d 520, 526].) It also bears reiterating, in this regard, that the use of age as a proxy for competence does have a major advantage over individualized evaluation. "The advantage is that . . . there is little or no discretion needed in determining how to apply it. . . . [T]he use of age takes on new social functions in a bureaucratic society. It makes decision-making easier for law-makers and government officials, as well as for judges. It is less costly than using more individualized assessments of functional age. Expediency and cost-effectiveness are important social values." (Neugarten, *Age Distinctions and Their Social Functions, supra,* 57 Chi.-Kent L.Rev. 809, 822-823; see also *Schweiker* v. *Gray Panthers* (1981) 453

U.S. 34, 48 [69 L.Ed.2d 460, 472, 101 S.Ct. 2633].) Furthermore, as recognized by the court in *Trafelet* v. *Thompson, supra,* 594 F.2d 623, an individualized removal procedure, "attended as it is with stigma to the judge, is unlikely to be used except in the most extreme cases. Informal pressures to retire are scarcely more effective. Usually the reluctance of judges to ask a colleague to step down is exceeded only by his reluctance to do so." (*Id.,* at p. 628, fn. omitted.)

As should be clear, we believe that the reduction of retirement benefits automatically imposed as an economic penalty upon one who remains in judicial office past the age of 70 reflects a questionable age stereotype. Perhaps a more equitable though still practical retirement system might be devised. (See, e.g., the rebuttably presumptive retirement age system discussed in Note, *Age Discrimination in Retirement: In Search of an Alternative, supra,* 8 Am.J. L. & Med. 433, at pp. 457-458.) In any event, as we have explained, it simply cannot be said that the imperfections of the challenged retirement system are so egregious or unmitigated that no rational basis can reasonably be conceived to justify it. In these circumstances, it is not the judicial function to set aside the scheme selected by the Legislature. (*McGowan* v. *Maryland* (1961) 366 U.S. 420, 426 [6 L.Ed.2d 393, 399, 81 S.Ct. 1101].)

The judgment is affirmed.

Smith, J., and Flaherty, J.,* concurred.

A petition for a rehearing was denied September 20, 1984, and appellants' petition for a hearing by the Supreme Court was denied November 15, 1984. Mosk, J., did not participate therein.

---

*Assigned by the Chairperson of the Judicial Council.